PARSKY & GALLOWAY, LLC
Christen E. McCullough, Esq. - Attorney ID #0242222008
466 Southern Boulevard,
Washington Building 1st Floor
Chatham, New Jersey 07928
T: 973-520-4340
F: 973-520-4329
cem@pg-lawoffice.com
***Attorneys for Defendant HOME DEPOT U.S.A., INC***.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

--------------------------------------------------------

RABBI ABRAHAM MYKOFF and POILE ZEDEK CONGREGATION, INC.,

                      Plaintiffs,

           -against-

HOME DEPOT, INC. and INTERTEK TESTING SERICES, N.A., INC.,

                    Defendants.

--------------------------------------------------------

Civil Action No.:  18-13110

**MEMORANDUM IN SUPPORT OF HOME DEPOT'S MOTION FOR SANCTIONS BASED ON SPOLIATION OF EVIDENCE**

        Defendant, Home Depot U.S.A., INC. ("Home Depot"), by its attorneys, submits this Motion for Sanctions Based on Plaintiff's Spoliation of Evidence.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................. ii

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................2

    A.    Polie Zedek Synagogue ......................................................2

    B.    Purchase and set up of the Cuori space heaters, and the fire. ...............3

    C.    The Police Investigation, and the Congregation's attempts to influence it. ......................................................................7

    D.    The space heaters after the fire...........................................11

    E.    The Property, and Plaintiff's initiation of a lawsuit against Home Depot. ....................................................................16

ARGUMENT ......................................................................................18

    1.    The Congregation cannot authenticate the space heaters...................18

    2.    Even if the Court allows introduction of the space heaters into evidence, the Plaintiff should still be sanctioned with an adverse inference due to unprecedented spoliation and resulting prejudice to Home Depot. ....................................................................21

CONCLUSION ....................................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*27-35 Jackson Ave., LLC v. Samsung Fire & Marine Ins. Co., Ltd.,*
469 N.J. Super. 200 (App. Div. 2021)................................................................21

*American Family Ins. ex rel. Dunn v. Black & Decker (U.S.), Inc.,*
2003 WL 22139788 (N.D. Ill. Sept. 16, 2003).....................................................28

*Brewer v. Quaker State Oil Ref. Corp.,*
72 F.3d 326 (3d Cir. 1995)...............................................................................22

*Cockerline v. Menendez,*
411 N.J. Super. 596 (App. Div. 2010)...............................................................21

*Mosaid Techs. Inc. v. Samsung Elecs. Co.,*
348 F. Supp. 2d 332 (D.N.J. 2004)....................................................... 22, 26, 27

*Ogin v. Ahmed,*
563 F. Supp. 2d 539 (M.D. Pa. 2008)..............................................................28

*Paris Bus. Products, Inc. v. Genisis Techs., LLC,*
2007 WL 3125184 (D.N.J. Oct. 24, 2007).........................................................27

*Schmid v. Milwaukee Elec. Tool Corp.,*
13 F.3d 76 (3d Cir. 1994)................................................................................27

*TelQuest Int'l Corp. v. Dedicated Bus. Sys., Inc.,*
CIV.A. 06-5359PGS, 2009 WL 690996 (D.N.J. Mar. 11, 2009).........................27

*United States v. Rawlins,*
53 V.I. 859, 606 F.3d 73 (3d Cir. 2010)............................................................18

*Veloso v. W. Bedding Supply Co.,*
281 F. Supp. 2d 743 (D.N.J. 2003)...................................................................22

*Zubulake v. UBS Warburg LLC,*
229 F.R.D. 422 (S.D.N.Y. 2004).......................................................................26

**Rules**

Federal Rule of Evidence 901 ........................................................................... 18, 29

Rule 901(b)(1) and (4) ...........................................................................................18

**Other Authorities**

5 Federal Evidence § 9:10 (4th ed.) ....................................................................18

## **INTRODUCTION**

This is a fire case wherein Poile Zedek Congregation asserts that a space heater purchased from Home Depot caused a fire at Poile Zedek Synagogue on October 23, 2015. Thus, central to the prosecution and defense of this case is the question of causation, i.e. whether the space heaters or some other circumstance present at the synagogue caused the fire. Some unorthodoxies in investigation and discovery give rise to this motion. For the following reasons, the Defendant submits this Court should find that spoilation occurred and the plaintiff is not permitted to introduce the subject space heater as evidence at trial. The Defendant further submits it is entitled to a spoliation inference whereby the jury will be instructed that proper notice of the fire to Home Depot would have resulted in evidence of alternative causes of the fire.

First, it is essential to note there were two identical space heaters that were purchased by Rabbi Mykoff and placed and either side of the bimah. Secondly, the Congregation failed to tag or otherwise identify the space heaters when they were recovered from the premises. Finally, the executive director of the Congregation immediately took possession of the space heaters after the fire. Shortly thereafter, he passed away and there is no other person who can authenticate the space heaters under rule 901. Because the evidence cannot be authenticated, Home Depot requests

a ruling that the space heaters be barred from being presented or admitted into evidence at trial.

Moreover, the Congregation failed to provide timely notice to Home Depot of the fire, effectively foreclosing Home Depot's access to evidence that could have provided proof of an alternative cause of the fire. The Congregation waited almost three years to institute a cause of action, which was Home Depot's first notice of the fire. Though Home Depot was afforded an opportunity (one) to inspect the premises, the inspection took place almost three years after the fire. Not only had the synagogue been exposed to the elements for three years at that point, but it had also been vandalized. Moreover, there were apparently inspections and the removal of various items authorized by the Congregation taking place during this time. The Congregation finalized the sale of the property in early 2019 shortly after Home Depot was made a party to the suit. Following the sale, the property was renovated and turned into apartments. The Congregation failed to properly notify Home Depot of the fire and the availability of the scene and therefore Home Depot is entitled to an adverse spoilation inference at trial.

## **BACKGROUND**

### A.    **Polie Zedek Synagogue**

Congregation Poile Zedek, Inc. is a New Jersey non-profit religious corporation, which had its place of worship at Poile Zedek synagogue, located at 145

2

Neilson Street, New Brunswick, New Jersey on or about October 23, 2015. (2nd Am. Complaint, Dkt. 31, ¶ 4). It is an orthodox Jewish synagogue, which meant that its congregants and Rabbi cannot, and could not, touch light switches or electrical appliances on the Sabbath, which lasted from sundown on Friday evening to nightfall on Saturday. (Belekin Tr. 23:4 – 23:8). As of October 23, 2015, Rabbi Abraham Mykoff was the Rabbi at Poile Zedek Congregation, and had been for approximately 40 years. (Mykoff Tr. 11:15 – 11:21). The synagogue was very old and believed to be constructed between 1923 and 1924. (National Register of Historic Places Registration Form, sec. 8, p.1). Robert Dorfman, now deceased, was the Executive Director, and ran the administration of the Congregation. (Mykoff Tr. 21:22 – 22:22). By October of 2015, prior to the fire, the Congregation had no property insurance in place because it had lapsed due to missed payments. (Kammer Tr. 35:5 – 35:13).

**B.    Purchase and set up of the Cuori space heaters, and the fire.**

On October 22, 2015, a Thursday, Rabbi Mykoff, acting on behalf of Poile Zedek Congregation, traveled to the Home Depot store located at 401 South Main Street, Milltown, NJ 08850, and purchased two space heaters, model number HD904-A7Q, manufactured and supplied to Home Depot by Cuori Electrical Appliances (Group) Co., Ltd. (2nd Am. Complaint, Dkt 31, ¶ 10; Mykoff Tr. 34, Mykoff Tr. 34:13 -34:17, 199, Receipt). He purchased the space heaters because he

was interested in trying to push off having to turn on the heat in the Poile Zedek Synagogue until it got colder. (Mykoff Tr. 30:3 – 30:22). After purchase, Rabbi Mykoff and an assistant, Robert Levinson (now deceased), brought the Cuori space heaters into the synagogue's basement, and plugged them in to ensure they worked. (Mykoff Tr. 38:18 – 37:2). The next day, Friday October 23, 2015, Rabbi Mykoff and Mr. Levinson installed the space heaters on the sanctuary floor, on the right and left sides of the bimah (the raised platform at the front of the synagogue on which the Rabbi stood during services). (Mykoff Tr., 33:2 – 33:25; 46:2 – 48:21). Rabbi Mykoff admitted that he did not read the instruction manuals for the heaters prior to using them. (Mykoff Tr. 43:16 – 43:25). If he did, he would have seen the following instruction:

14)    Always plug heaters directly into a wall outlet/receptacle. Never use with an extension cord or relocatable power tap (outlet/power strip)(HD 000077). Rabbi Mykoff also did not read any of the warnings or instructions on the boxes or the space heaters themselves prior to using the space heaters. (Mykoff Tr. 236:4 – 236:13).

A picture of the raised bimah taken from the balcony prior to the fire was produced by Plaintiff during discovery and is shown below:



The bimah had two outlets that were used to power the space heaters, one that was located in the center of the bimah, and other was located on the front, right hand side. (Mykoff Tr. 48:2 – 49:20). The Rabbi did not observe Mr. Levinson read the product manual prior to installing the space heaters. (Mykoff Tr. 44:6 – 44:14). There was an outlet in the front of the bimah in the right corner, and one space heater was plugged directly into that outlet. (Mykoff Tr. 61:20 – 61:23). The left space heater was plugged into the center outlet. Rabbi Mykoff admitted that he "possibly" used an extension cord. (Mykoff Tr. 63:4 – 65:8). He also admitted to raising the platform with a piece of wood to allow clearance for the cord/plug. (Mykoff Tr. 63:4 – 65:8). A circuit breaker box in the sanctuary controlled the electricity for all outlets

and lights in the sanctuary. (Mykoff Tr. 59:12 – 59:25; 60:7 – 60:24). Rabbi Mykoff and Mr. Levinson adjusted the space heaters to the "on" position. (Mykoff Tr. 70:2 – 70:25). For most of the week, power in the sanctuary was normally kept off via the circuit breaker switches. (Mykoff Tr. 71:24 – 73:4). Therefore, even though the space heaters were on, no power was supplied to the space heaters because the circuit breakers were off. (Mykoff Tr. 70:6 – 70:12).

Services were held in the sanctuary only on Saturdays (the sabbath) (Mykoff Tr.72:3 – 72:7), and therefore the power had to be turned on via a special procedure. (Mykoff Tr. 74:4 – 74:16). On Friday evening, Sergei Belekin, the caretaker, would turn all circuit switches to the "on" position, such that power would be flowing to the sanctuary. (Belekin Tr. 23:9 – 23:24, Belekin Tr. 35:22 – 36:19). Then he would go downstairs to the basement and hit a button on a clock timer. (Belekin Tr. 23:9 – 23:24, Mykoff Tr. 75:7 – 76:6). The clock timer would then cut the power to the sanctuary until about 8:00am on Saturday morning. (Mykoff Tr. 75:7 – 76:6). The power would automatically turn on at 8:00am on Saturday morning so the sanctuary was ready for services at 9:00am. (Mykoff Tr. 75:7 – 76:6).

Rabbi Mykoff testified that he left the space heaters "on" when he installed them so that Sergei Belekin would not have to do anything regarding the space heaters, and instead, would simply follow the above-described procedure and the space heaters would be turned on via the timer. (Mykoff Tr. 74:4 – 74:16). After

6

installing the space heaters and plugging them in, Rabbi Mykoff left the synagogue. (Mykoff Tr. 70:2 – 70:12, 73:5 – 73:16; Belekin Tr. 30:21 - 25). Later on, as per his usual procedure described above, Sergei Belekin flipped the circuit breakers to the "on" position—providing power to the subject space heaters—and then walked downstairs and hit the button the clock timer—cutting the power until the following morning, in theory. (Belekin Tr. 35:22 – 37:2). Thereafter, Belekin helped bring in bread for services the following day, and then he read the paper in the basement. (Belekin Tr. 37:19 – 37:25). While reading the paper, Belekin heard several loud "bam" noises in two separate groups coming from upstairs, in the sanctuary. (Belekin Tr. 38:9 – 38:22). He then went upstairs to the sanctuary floor and saw a fire on the right side of the bimah. (Belekin Tr. 39:6 – 39:12; 41:3 – 41:15). He only witnessed the fire for three or four seconds before going back to the basement to call emergency services. (Belekin Tr. 41:3 – 41:15). From where he was standing—at the front of the synagogue looking over the pews to the bimah area—he could not see the space heaters, which were on the floor and obstructed by the pews. (Belekin Tr. 42:14 – 42:21). After calling emergency services, Belekin did not return to the sanctuary to witness the fire. (Belekin Tr. 42:22 – 42:24).

## C.    The Police Investigation, and The Congregation's Attempts to Influence it.

The fire was investigated for arson by Detective Todd O'Malley of the Middlesex County Prosecutor's Office. (O'Malley Tr. 10:1 – 11:24). Detective

O'Malley testified he made the determination to investigate for arson due to the peculiarities of the fire and the size of the loss. (O'Malley Tr. 14:9 – 14:20). Detective O'Malley's signed his final report on March 27, 2017, approximately a year and half after the fire. Detective O'Malley testified that it was not normal to have such a large interval between the time he performed his investigation and the time he concluded his report. (O'Malley Tr. 18:2 – 18:24). However, he testified he finished the report after he retired, but while he was still being paid, because he wanted to tie up loose ends. (*Id*.). O'Malley testified (and his report reflects) that he ultimately could not find evidence of arson. (O'Malley Tr. 18:25 – 19:7). Based on the statements of Sergei Belekin and his review of the scene, O'Malley determined the area of origin to be right side of the bimah. (O'Malley Tr. 19:8 – 21:2). Detective O'Malley did **<u>not</u>**, however, determine what caused the fireand did not in any way find or even imply that the space heaters were a cause. (O'Malley Tr. 17:4 – 17:11). Regarding the cause, Detective O'Malley testified:

> [I]t could have been the outlet, it could have been the vented extension cord that was underneath the platform arcing, it could have been the timers failing, it could have been the switches he manipulated manually every week for the timers to activate. There's a lot going on that I could never eliminate as a cause of the fire.

(O'Malley Tr. 81:10 – 81:16). Detective O'Malley stuck to this conclusion (that the cause could not be determined) even though Robert Dorfman, the executive director of the synagogue, pressured Detective O'Malley to pin the fire on the space heaters

in the weeks following the fire. (O'Malley Tr. 41:8 – 42:23). Detective O'Malley estimated that there were likely a hundred calls from Mr. Dorfman before he passed away. (O'Malley Tr. 41:11 – 42:23). Despite the numerous calls, Detective O'Malley testified that it was very difficult to get information from the Congregation, and perhaps it was because they knew he was not Jewish. (O'Malley Tr. 71:3 – 72:21). Mr. Dorfman passed away in September of 2016 prior to the finalization and distribution of Detective O'Malley's report. (Kammer Tr. 14:16 – 14:20).

After Detective O'Malley finished his report, and after that report had been produced to Home Depot, Rabbi Mykoff wrote a letter dated June 25, 2020 to the Prosecutor's office seeking to have the report changed. (Mykoff Tr. 173:22, and see the letter, Ex. D). Rabbi Mykoff was concerned that "If the factual errors in the 2017 report are not corrected, **they have the potential to injure the Congregation in its effort to recover compensation for the loss of the building**." (Ex. D to Mykoff Tr.). (emphasis added) During his investigation, Detective O'Malley recovered a Sunbeam (Holmes brand) heater from the scene (in addition to the Cuori heaters) and found that Sunbeam heaters had undergone a recall based on reports that the unit can spray heated oil, causing property damage. (O'Malley Tr. 56:11 – 56:24). Though Detective O'Malley did not conclude that the Sunbeam or any other space heater caused the fire Rabbi Mykoff questioned why the Detective even considered

it in his investigation, stating "How did the wrong brand name get into the report?" (Ex. D to Mykoff Tr.). The letter, which Mykoff admitted Yakov Burr[1] wrote for him (Mykoff Tr. 202:3 – 203:12), is filled with various argumentative assertions which all are aimed attempting to get the prosecutor's office to conclude that the Cuori space heaters started the fire, and admittedly to assist in the Congregation's civil case.[2] For example, the letter requested the insertion of the "fact" that the Cuori space heaters had eight (8) foot power cords, yet Mykoff never measured the power cords on the subject heaters. (Mykoff Tr. 208:3 – 208:14). While Detective O'Malley indicated that there was evidence of use of extension cords (which the manual for the subject product forbids) (O'Malley Tr. 21:4 – 21:22, 24:8 – 24:18, 25:15 – 25:23, 78:14 – 80:25), Mykoff's letter stated, unequivocally, that no extension cords were in use on the sanctuary floor. (Ex. D). Mykoff later retracted that statement during his deposition, admitting it could be incorrect. (Mykoff Tr. 220:15 – 221:17). As another example, the letter implored the Prosecutor's office to adopt the following as fact for purposes of his report:

> The question remains: What happened to the Cuori Brand space
> heater that was placed on the side of the bimah where the elderly

---

[1] Yakov "Jack" Burr was a congregant at the Poile Zedek and assisted Rabbi Mykoff with investigating after the fire, who Rabbi Mykoff testified discovered the right side space heater. (Mykoff Tr. 144:12 – 144:24, 148:7 – 148:9).

[2] The letter plainly states: "However, your Office recently sent a copy of the 2017 report to defendants in a federal civil suit for money damages growing out of the product liability complaint by Congregation Poile Zedek, where I have served for over three decades as Rabbi. The factual errors in the arson investigation report, while irrelevant to the question of arson, are no longer harmless when recycled into a civil suit.
If the factual errors in the 2017 report are not corrected, they have the potential to injure the Congregation in its effort to recover compensation for the loss of the building. Accordingly, I am asking the Prosecutor to review the attached pages, comprising a proposed revision to the 2017 report."

men like to sit? At the moment of the fire, this heater exploded and flew like a rocket some fifteen feet toward the right side windows of the sanctuary. It remained on the (unburned) floor of the sanctuary throughout the fire and the subsequent investigation. The investigators from the Prosecutor's Office did not discover that heater, perhaps because they regarded the upper floor too unsafe to traverse on the day they went there. Moreover, as soon as they saw two heaters, they believed that they need look no further.

A few days later, the Congregation's investigator discovered the heater. It had bulging fins with holes resembling bullet holes, evidencing the explosion that had occurred inside the heater.

The Congregation's investigator reported the heater to a federal Agency, which dispatched its own investigator. This space heater was located in the place that the Prosecutor's report described as "the area of origin" on page (2), and "point of origin" on page (7), "approximately located on the floor of the synagogue in the area located to the right side of the bimah next to a lecturer's podium". Stated differently, the heater that the Prosecutor's investigators missed because it was unsafe to walk there, was subsequently found to be resting squarely in the area that the Prosecutor's investigators concluded was the "point of origin" of the fire.

(See Mykoff Letter, O'Malley Tr. Ex. B). The identify of the "investigator" is that is referred to in the above portion of Rabbi Mykoff's letter is unclear.

## D.    The space heaters after the fire.

It is unclear exactly what happened to subject space heaters after the fire because there is no chain of custody for approximately three years after the fire. (Burr Tr. 71:2 – 72:9). Detective O'Malley testified that he thought the prosecutor's office took them (O'Malley Tr. 40:7 – 40:10), but later seemed to doubt whether

they ever took them. (O'Malley Tr. 65:25 – 66:19). Rabbi Mykoff testified that he believed Mr. Dorfman took them and put them in his personal storage space, but then admitted that he wasn't sure. (Mykoff Tr. 136:18 – 138:15). There is no record of the space heaters ever being labeled or tagged prior to Mr. Dorfman's alleged storage of those heaters. At some point after the fire, but prior to Mr. Dorfman's death in September of 2016, Rabbi Mykoff and Mr. Dorfman decided to ship the space heaters to a laboratory in Maryland for inspection. Rabbi Mykoff could not testify where laboratory this was, what was done to the space heaters during that inspection, or whether he ever received a report from that inspection:

> Q  Are you aware of any inspections prior to July 22nd, 2019 other than the one in your living room?
> A  There is a possibility that there was another inspection.
> Q  Okay. When was that other inspection?
> A  I don't remember. It was in a different -- before Mr. Lakind. Before Mr. Lakind.
> Q  Okay. Was that while you had hired an attorney on your behalf?
> A  No. Because it -- the attorney that I hired was Mr. Lakind. I don't think I had an attorney prior to that.
> Q  Okay. So this other inspection was prior to Mr. Lakind's involvement. So I guess we can go back and see when the case was filed. But do you recall what year that was, sir?
> A  No.
> Q  Okay. And where did that other inspection take place?
> A  I do not remember.
> Q  Who attended that other inspection?
> A  It was the inspector, whoever inspected it.
> Q  Where did that other inspection take place?
> A  In their facility, in their office.
> Q  Where was that?
> A  Again, I don't recall.

12

Q  What state was it in?

A  I suspect Maryland. I'm not sure.

Q  Did you go to this inspection?

A  No. I wasn't there.

Q  Why do you suspect that there was an inspection in Maryland?

A  Because I think I had shipped it to Maryland to reinspect it.

Q  Shipped what to Maryland?

A  The heater.

Q  One or two?

A  I believe one.

Q  Earlier you testified quite extensively that you did not have possession of the space heaters allegedly involved in this incident until they showed up in your living room at some point. How is it that you shipped one of those space heaters to Maryland if they were not in your possession until it showed up in your living room?

A  Because it wasn't necessarily from my -- could have been from Mr. Dorfman's, was shipped to that. I don't recall. It was shipped maybe from him.

Q  Okay. Sir, you very clearly just testified a moment ago that you shipped it. Do you recall as you sit here today who shipped one of the alleged space heaters to Maryland?

A  I cannot tell you. I don't know.

Q  Who would have a record of shipping a space heater to Maryland?

A  I don't know that there is, that I have a record of such.

Q  Did you pay -- did someone pay the facility in Maryland for this inspection?

A  I believe so.

Q  Who paid them?

A  It would be the congregation.

Q  Was this in 2015, '16, '17, '18 or '19?

A  Before Mr. Lakind was directly involved.

Q  What was done at this inspection in Maryland?

A  I can't -- I don't know.

Q  Who selected the facility in Maryland?

A  Who selected it? I guess it was a choice with Mr. Dorfman and myself.

Q  Did you obtain a written report from that facility?

A    I don't know. I don't remember. I don't have it. Put it that way.

Q    Did you get a copy of the report and dispose of it?

A    I have no recollection. I have a recollection that there was an individual, an organization that was supposed to pick it up.

Q    What type of organization was this?

A    Expert, electrical expert, put it that way.

Q    Did anyone from the congregation attend the inspection in Maryland?

A    No.

Q    As you sit here today, do you have any idea what happened to the space heater during that inspection?

A    No. I can't tell you.

(Mykoff Tr. 228:19 – 232:12). Furthermore, Rabbi Mykoff did not know when or where the space heater was returned, but guessed it was sent to Mr. Dorfman. (Mykoff Tr. 233:9 – 233:14).

Eric Kammer, testifying on behalf of the Congregation, testified that Rabbi Mykoff told him that the space heaters were stored at Edison Lockup, a local facility with a store space rented by the Congregation (as opposed to Mr. Dorfman's personal space), after the prosecutor's office returned them. (Kammer Tr. 72:4 – 73:25). Rabbi Mykoff testified that the heaters arrived in his living room for an inspection, but he could not recall exactly when that was. (Mykoff Tr. 138:23 – 139:12). Mr. Kammer testified the heaters were transferred to Rabbi Mykoff sometime in 2018(), and were delivered there by Kevin Leff, the congregation member who managed the storage unit. (Kammer Tr. 72:8 – 72:19 and 73:8 – 73:20). Based on the testimony of Rabbi Mykoff, Detective O'Malley, and Eric Kammer, it is undeniable the space heaters were never tagged right or left. That is, they were not

labeled so that each space heater could be individually identified. Moreover, Mr. Kammer testified he did not know whether the space heater in the photograph below was on the left side or right side of the bimah. (Kammer Tr. 135:17 – 135:22).



(Exhibit K, Kammer Tr.). Nor did Mr. Kammer know whether the heater depicted below was on the right or left of the bimah:



According to Rabbi Mykoff, it is possible an inspection of the space heaters occurred prior to attorney Lakind's involvement. (Mykoff Tr. 228:19 – 229:17). Neither Rabbi Mykoff nor the Congregation have ever identified who performed the inspection, when that inspection occurred, or exactly what occurred at the inspection.

**E.    The Property, and Plaintiff's initiation of a lawsuit against Home Depot.**

After the death of Mr. Dorfman, in late 2016 or early 2017, the congregation decided to put the property up for sale, due to its dire financial condition. (Greenberg Tr. 31:10 – 32:23). Home Depot was not notified of the fire until it was served with the Complaint on July 13, 2018, nearly 3 years after the fire. (Dkt. 20). It is still unknown exactly who had access to the property after the fire and what those individuals may have removed from the property; we do know the property had

numerous individuals inside prior to the Complaint being filed and Home Depot being made aware of this incident. For example, Rabbi Mykoff testified that, during the period between the fire and the sale of the building in 2019, there were many items from the building were intermittently removed in various cleanup efforts. (Mykoff Tr. 158:12 – 158:22). Rabbi Mykoff testified he had collected a large number of items from the property and stored those items in garbage bags, but those bags subsequently "disappeared." (Mykoff Tr. 162:3 – 162:24). He testified that Sergei Belekin and Robert Dorfman also had access to the property during that time. (Mykoff Tr. 159:7 – 159:12). According to Rabbi Mykoff, at least one congregant was in the synagogue after the fire to take pictures. (Mykoff Tr. 169:3 – 169:7). Mr. Burr was also inside the synagogue during this time to conduct two of his own "inspections." (Burr Tr. 61:18 – 62:21). Rabbi Mykoff further testified, though he wasn't certain who had keys to the building, the synagogue was vandalized and over the years, various individuals had access to and went inside to remove items. (Mykoff Tr. 159:7 – 159:19). Mr. Kammer, testifying on behalf of the congregation, stated that there may have been a fire inspection that took place at the synagogue between 2015 and 2018. (Kammer Tr. 75:11 – 75:18). Yakov Burr testified, at the funeral for the torahs, numerous members of the public were allowed inside the synagogue in order to claim personal property. (Burr Tr. 82:12 – 82:18; 110:2 – 110:13).

Moreover, until the synagogue was sold, the inside of the synagogue was exposed to the elements because the roof collapsed during the fire. (Mykoff Tr. 158:1 – 158:11). The property was ultimately sold in 2019 for $550,000, against Rabbi Mykoff's wishes. (Kammer Tr. 134:1 – 134:3). It was developed into an apartment building called The Lofts at Neilson Crossings.

## **ARGUMENT**

**1.    The Congregation cannot authenticate the space heaters.**

Federal Rule of Evidence 901 requires a proponent of evidence to "… produce evidence sufficient to support a finding that the item is what the proponent claims it is." Typically, in relation to physical evidence, this is accomplished by tagging and keeping a chain of custody for the tagged evidence. *United States v. Rawlins*, 53 V.I. 859, 872, 606 F.3d 73, 82 (3d Cir. 2010), and see, § 9:10 Physical objects under Rule 901(b)(1) and (4)—Chain of custody, 5 Federal Evidence § 9:10 (4th ed.). A chain of custody shows the possession of the item all the way back to its recovery, logically demonstrating that the item is what the proponent claims.

In this case, the Congregation claims that Rabbi Mykoff purchased two identical Cuori space heaters from Home Depot and placed those space heaters on the right and left side of the bimah (Mykoff Tr., 33:2 – 33:25; 34:13 -34:17 and 46:2 – 48:21; Kammer Tr. 99:25 – 101:8). The Congregation alleges the fire began in the

space heater that was located on the right side of the bimah. (Kammer Tr. 129:16 – 130:8). However, there is no evidence that the space heater on the right side of the bimah was ever tagged for identification, no chain of custody, and no witness (still living) can testify to how it was kept in the three years between the time of the fire and the time that Home Depot was notified of the suit. The congregation can offer no evidence that the space heater now involved in the lawsuit is the same one that was pulled from the scene *allegedly* by Mr. Dorfman or is in the same condition as when it was recovered from the scene.

For example, Rabbi Mykoff testified he thought Mr. Dorfman took possession of both space heaters after the fire, but he did not actually see their removal. (Mykoff Tr. 136:18 – 136:22). Instead, he testified Mr. Dorfman told him that, but he could not say when Mr. Dorfman told him, and did not know whether Mr. Dorfman himself, or an assistant, actually removed the space heaters. (Mykoff Tr. 137:13 – 137:20). Rabbi Mykoff believed that Mr. Dorfman took them to a storage facility, but he never saw them placed there and he didn't even remember Mr. Dorfman telling him they were taken there. (Mykoff Tr. 138:2 – 138:12). Yakov Burr, who claims to have found the space heater that is alleged to be the cause of the fire in the days following the fire, testified that he did not know what happened to the space heater after he saw it laying on the ground in the synagogue. (Burr Tr. 115:6 – 116:7).

Rabbi Mykoff also testified that he sent one of the space heaters to a laboratory in Maryland for testing sometime prior to the involvement of his attorney, but later admitted that it must have been Mr. Dorfman that sent the heater to a laboratory in Maryland. (Mykoff Tr. 228:19 – 233:14). Rabbi Mykoff did not know what was done to the space heater that was sent to the laboratory, did not know who inspected the space heater, and did not have any materials related to this inspection. *Id*. Rabbi Mykoff thought he recalled Mr. Dorfman taking possession of the heater that was received from the Maryland investigation, but he did not know:

> Q   Was this space heater which you believe Mr. Burr found on the sanctuary floor, was that subsequently removed?
> A   Yes.
> Q   By whom?
> A   I would imagine by the same party, Mr. Dorfman, later on after the report to the what-do-you-call-it, federal government.
> Q   And, sir, I'm going to go back to my same adage that we've repeated many times. I'm not asking what you imagine. I'm asking what you actually know.
> A   I don't know.

(Mykoff Tr. 146:20 – 147:7). Eric Kammer, testifying on behalf of the Congregation, when shown pictures of the space heaters, could not discern which was the "right" space heater, and which was the "left" space heater. (Kammer Tr. 135:17 – 135:22). Because Mr. Dorfman passed many years ago, no living person can authenticate that the space heaters claimed to have caused the fire in this case are the same space heaters that were actually pulled from the synagogue and are in the same condition

20

as they were when they were pulled from the synagogue. Simply put, the Congregation can offer no admissible evidence that the space heater is what the Congregation claims it is.

**2.      Even if the Court allows introduction of the space heaters into evidence, the Plaintiff should still be sanctioned with an adverse inference due to unprecedented spoliation and resulting prejudice to Home Depot.**

Despite knowing that it intended to pursue Home Depot for damages almost immediately after the fire, Rabbi Mykoff and the Congregation waited almost **three years** to even alert Home Depot of the fire. As set forth at length above, per the testimony of the Rabbi and others, during that time, numerous individuals had access to the site. Further, Rabbi Mykoff and other congregants engaged in affirmative actions to tamper with fact evidence in this case. The Congregation, as the only remaining plaintiff, should be sanctioned for this conduct.

Though New Jersey courts do not recognize a separate cause of action for spoliation, sanctions may be imposed on litigants who fail to properly preserve evidence. Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition. *27-35 Jackson Ave., LLC v. Samsung Fire & Marine Ins. Co., Ltd.*, 469 N.J. Super. 200, 209 (App. Div. 2021), citing *Cockerline v. Menendez*, 411 N.J. Super. 596, 620 (App. Div. 2010), other citations omitted. Spoliation may be found where: (1) there is evidence within a party's control; (2)

which was suppressed or withheld by a party; (3) and was relevant to claims or defenses of the parties; and (4) it was reasonably foreseeable that the evidence would later be discoverable. *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004), citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995), and *Veloso v. W. Bedding Supply Co.*, 281 F. Supp. 2d 743, 746 (D.N.J. 2003). This Court may impose sanctions pursuant to the Federal Rules of Civil Procedure and the Court's inherent authority. *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004

Here, all factors related to spoliation are easily met. It is plainly true that the Poile Zedek synagogue and its contents were in the complete control of the congregation from the time of the fire (October 23, 2015) until the time of the sale of the synagogue in early 2019. The central issue of this litigation is whether the space heaters purchased by Rabbi Mykoff at Home Depot caused the fire that occurred on October 23, 2015. As in all fire cases, the building itself would have contained all relevant evidence immediately after the fire—including the space heaters—but also including remnants of extension cords, the outlets on the sanctuary level and the conduit serving those outlets, the timer, and the fallen bimah itself. In fact, Detective O'Malley thought any these items could have been a cause of the fire:

> [I]t could have been the outlet, it could have been the vented extension cord that was underneath the platform arcing, it could have been the timers failing, it could have been the switches he manipulated manually every week for the timers to activate.

> There's a lot going on that I could never eliminate as a cause of the fire.

(O'Malley Tr. 81:10 – 81:16). Had Home Depot received notice of the fire immediately after it occurred, Home Depot could have inspected the premises and determined what evidence from the fire was relevant to any claims or defenses. The parties could have agreed upon the preservation of certain items *prior to* interference with the site by third parties. Currently the only remnants from the fire are the space heaters (which, as shown above, cannot even be properly authenticated). Moreover, by the time Home Depot was in the lawsuit in 2018, the congregation was in the process of selling the property to a third party. There is no record of how many people were in and out of the property over the years, or what they removed from the property, but the witnesses agree that many individuals were at the property and removed items prior to Home Depot's access.

The Congregation had every opportunity to inform Home Depot of the fire in the immediate aftermath, yet inexcusably declined to do so. The Congregation knew that litigation with Home Depot was likely because (1) Rabbi Mykoff knew he purchased the space heaters the day before the fire at a Home Depot store (Mykoff Tr. 34, Mykoff Tr. 34:13 -34:17, 199, Receipt); and (2) Robert Dorfman, the former executive director of Poile Zedek, pressured Detective Todd O'Malley to find that the fire was caused by the space heaters. (O'Malley Tr. 41:11 – 42:23). Yakov Burr also testified that Rabbi Mykoff had his mind made up that the space heaters caused

the fire in the days following the fire, when he entered the building to investigate and found the second space heater. (Burr Tr. 111:4 – 115:5). Clearly, the congregation had a reason to know that litigation with Home Depot was likely in the immediate aftermath of the fire. Yet, Home Depot was not apprised of the fire until it was sued—almost three years later. This deprived Home Depot of the chance to inspect the building prior to three years of exposure to the elements and three years of individuals associated with the congregation rummaging through the building. It also allowed the Congregation to undertake unilateral inspections of the subject heaters with no agreed upon protocols. Rabbi Mykoff admitted he shipped one of the heaters to Maryland for an inspection. We do not know *who* the "inspector" was; nor do we know *what* was done to the heater at the inspection or even which heater it was. (Mykoff Tr. 228:19 – 232:12).

Even more audacious is Rabbi Mykoff's letter to the Middlesex County Prosecutor's Office seeking substantive changes to Detective O'Malley's findings— the only "neutral" individual to inspect the building in the immediate aftermath of the fire. Rabbi Mykoff sent this letter for the explicit purpose of correcting "factual errors" that could be detrimental to the Congregation "…in its effort to recover compensation for the loss of the building." (O'Malley Tr., Exhibit B). Rabbi Mykoff admitted to sending the letter at his deposition. (Mykoff Tr. 173:22 – 173:25; 199:24 – 202:7). At the time that he sent the letter, the lawsuit against Home Depot was well

underway and Rabbi Mykoff was the first named plaintiff in the case.[3] Thus, Rabbi Mykoff was specifically attempting to alter the operative facts of the lawsuit by sending the letter to the Middlesex County Prosecutor's Office. Detective O'Malley testified that, in his 25 years of arson investigation, he had never received a request like Rabbi Mykoff's. (O'Malley Tr. 62:14 – 62:19). Further, the report was replete with suggested "findings" that it sought to have included which Detective O'Malley either did not recall or completely disagreed with:

| Requested "Finding" from Letter | Detective O'Malley Testimony |
| --- | --- |
| The heaters are semi-filled with waste automotive crankcase oil that is more volatile than new petroleum oil. | O'Malley could not testify what they were filled with because he did not know. (O'Malley Tr. 65:3 – 65:11) |
| The congregation's investigator—and not the prosecutor's office—discovered the second heater (the heater the Congregation claims to have caused the fire). | O'Malley testified that he recalled discovering both heaters. (O'Malley Tr. 65:25 – 66:7). He also recalled receiving a call from someone holding themselves out as the Congregation's investigator. (O'Malley Tr. 65:12 – 65:24). |
| The heater had bulging fins which evidenced an explosion that occurred inside the heater. | O'Malley testified that he could not determine whether the deformities of the heaters were caused by the fire, or were themselves the cause of the fire. (O'Malley Tr. 67:6 – 67:19). |
| The heater flew like a rocket through the air. | O'Malley never saw anything to lead him to the conclusion that the heater flew like a rocket;nor did Sergei Belekin tell O'Malley that he saw anything similar. (O'Malley Tr. 69:7 – 70:8). |
| Detective O'Malley misunderstood Sergei Belekin due to a language barrier. | O'Malley testified he experienced no difficulty whatsoever in understanding Mr. Belekin. (O'Malley Tr. 70:9 – 70:17). |

---

[3] Rabbi Mykoff was not dismissed as a plaintiff until February 23, 2021.

Clearly, the requests contained in the letter were asking the Prosecutor's Office to include findings that had no support and/or were in fact opposite to what the Detective's investigation showed—and admittedly for the explicit purpose of aiding the Congregation in its lawsuit against Home Depot. Moreover, and rather ironically, Detective O'Malley testified that, when he began his investigation, the Congregation did not cooperate with him. (O'Malley Tr. 71:22 – 72:21). Plainly, the Congregation actively obstructed access to information for anyone they did not see as sharing their interests, which is a hallmark of bad faith. When evidence is destroyed in bad faith (*i.e.,* intentionally or willfully), that fact alone is sufficient to demonstrate relevance. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004). This cannot go unremedied.

Evidence of spoliation may give rise to sanctions, including: (1) dismissal or granting judgment in favor of prejudiced party; (2) suppression of evidence; (3) an adverse inference, known as the spoliation inference; (4) fines; and (5) attorneys fees and costs. *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004), other citations omitted. Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been in without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be

dealt with appropriately if need be. *Id.* The adverse inference is a lesser sanction than dismissal of the offending party's case or the suppression of evidence and permits the jury to infer that the evidence destroyed would have been unfavorable to the offending party. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

At a minimum, this case warrants the imposition of an adverse inference. This Court imposed an adverse inference in the case of *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 338 (D.N.J. 2004). In *Mosaid*, the aggrieved party did not show that Samsung's spoliation was in bad faith/intentional. Quite simply, the Court imposed an adverse inference sanction because Samsung knew it had a duty to preserve relevant emails, yet failed to do so. *Id.* at 338. This case is even more egregious because Rabbi Mykoff's letter to the Prosecutor's office and the Congregation's unwillingness to provide information to the Prosecutor's office during the investigation stage demonstrate bad faith. See also, *TelQuest Int'l Corp. v. Dedicated Bus. Sys., Inc.*, CIV.A. 06-5359PGS, 2009 WL 690996, at *5 (D.N.J. Mar. 11, 2009), holding that a defendant's deletion of electronic records after the start of litigation constituted spoliation of evidence and that the imposition of an adverse inference was appropriate; *Paris Bus. Products, Inc. v. Genisis Techs., LLC*, CIV. 07-0260JBS, 2007 WL 3125184, at *4 (D.N.J. Oct. 24, 2007), holding that defendant's deletion of records was sufficient grounds for the imposition of an

adverse inference; and *Ogin v. Ahmed*, 563 F. Supp. 2d 539, 546 (M.D. Pa. 2008), finding that an adverse inference is the least severe sanction available based on defendant's destruction of driver's logs.

*American Family Ins. ex rel. Dunn v. Black & Decker (U.S.), Inc.*, is instructive. 00 C 50281, 2003 WL 22139788 (N.D. Ill. Sept. 16, 2003). There, the Northern District of Illinois held that Plaintiff's failure to preserve a fire scene, including it failure to preserve possible alternative causes of a fire, warranted a suppression of evidence sanction against the plaintiff. The court stated:

> Plaintiff had a duty to preserve all evidence of alternate causes of the fire. Plaintiff did not do so. It failed to preserve the electrical receptacle, switch and cappuccino maker. It's investigator believed the cause of the fire was the toaster oven at the time of his investigation but plaintiff did not notify defendant and provide defendant a chance to conduct its own investigation until more than one year later. By that time, defendant, to its prejudice, could not conduct a meaningful investigation of the fire scene. The alteration of the toaster oven and the destruction of the tape of Mr. Dunn's statement compounded defendant's difficulties in investigating the cause of the fire. Because plaintiff failed to preserve evidence which may have been, or shed light upon, an alternative cause of the fire, plaintiff has deprived defendant of the ability to establish its case.

*American Family Ins. ex rel. Dunn v. Black & Decker (U.S.), Inc.*, 00 C 50281, 2003 WL 22139788, at *1 (N.D. Ill. Sept. 16, 2003). In our case, the timing is even worse. Home Depot did not know of the fire until almost three years later. Home Depot requests an adverse inference, whereby the jury will be instructed that proper notice

of the fire and preservation of the premises would have produced evidence of an alternative cause of the fire.

## **CONCLUSION**

For the foregoing reasons, Home Depot requests that this Honorable Court enter an order finding as follows:

(1) The space heaters cannot be authenticated pursuant to Federal Rule of Evidence 901, and they are barred from being introduced at trial; and

(2) Based on the Congregation's failure to properly notify Home Depot of the fire, the jury will be instructed that proper notification of the fire to Home Depot would have produced evidence of an alternative cause of the fire.

**PARSKY & GALLOWAY, LLC**

By:    /s/ Christen E. McCullough

Christen E. McCullough (024222008)
466 Southern Boulevard
Washington Building, 1st Floor
Chatham, New Jersey 07928
cem@pg-lawoffice.com

Dated:       October 30, 2024