**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RABBI ABRAHAM MYKOFF and POILE ZEDEK CONGREGATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>HOME DEPOT, INC. and INTERTEK TESTING SERVICES, N.A., INC.,<br><br>Defendants. | Civil Action No. 18-13110 (GC) (TJB)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendant Home Depot, Inc.'s Motion for Sanctions (ECF No. 180), and the parties' respective *Daubert* Motions (ECF Nos. 179, 181, 182, and 183). The parties all filed responses to the Motions. (ECF Nos. 185, 186, 187, 188, 189, 190, 191, 192, 193, 194.) At the Court's request, the parties also filed supplemental briefs regarding Home Depot's Motion for Sanctions. (ECF Nos. 215, 222.) The Court has carefully reviewed the parties' submissions and decides the matter following oral argument and a *Daubert* hearing on May 27, 2026. (*See* ECF No. 241.) For the reasons set forth below, and other good cause shown, Home Depot's Motion for Sanctions, (ECF No. 180), is **GRANTED in part** and **DENIED in part**. Home Depot's Motions to exclude Plaintiff's experts, (ECF Nos. 181, 182, 183), are **GRANTED in part** and **DENIED in part**. Plaintiff's *Daubert* Motion, (ECF No. 179), is **DENIED**.

# I. BACKGROUND

## A. Factual Background

### 1. *The fire*

This matter involves a fire that occurred at Congregation Poile Zedek, a synagogue in New Brunswick, New Jersey, on or about October 23, 2015. (ECF No. 31 ¶ 14.)[1] In 2015, Abraham Mykoff was the rabbi for Poile Zedek, and Robert Dorfman, the Executive Director, handled the administration of the synagogue. (ECF 180-3, Mykoff Tr. at 11:15-21, 22:4-17.)

The day before the fire, Rabbi Mykoff purchased two space heaters from Home Depot to provide heating for Poile Zedek. (ECF No. 31 ¶ 10.) The heaters were manufactured and supplied to Home Depot by Cuori Electrical Appliances Co., Ltd. (Mykoff Tr. at 34:13-15; 180-4 at 217.) After purchasing the space heaters, Rabbi Mykoff and a congregant, Robert Levinson, brought the space heaters into the basement and plugged them in for a moment to ensure they worked. (*Id.* at 36:18-37:2, 42:23-43:12.) On the day of the fire, Rabbi Mykoff and Levinson installed the space heaters on the sanctuary floor next to the bimah and on the bimah itself.[2] (*Id.* at 48:9-49:4, 62:1-10, 63:4-9, 179:25-180:3, 260:25-261:5.) One space heater was placed on the left side of the bimah and plugged into an outlet located in the bimah's center, and the second space heater was placed on the right side of the bimah and plugged into an outlet located on the bimah's right corner. (*Id.* at 48:9-50:16, 63:4-23.) Rabbi Mykoff testified that there was a wooden platform over the outlet in the center of the bimah. (*Id.* 55:6-57:4.) He testified that, when one of the space heaters was plugged into that outlet, the plug protruded and hit the wooden platform, so Levinson raised the

---

[1] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties. For citations to transcripts, however, the Court refers to the page and line numbers paginated by the reporter.

[2] A bimah is a raised platform/stage where prayer services are conducted and where the rabbi stands during services. (*See id.* at 48:19-20, 51:21-24; ECF No. 180-2 at 8.)

platform to allow clearance for the heater's plug and cord. (*Id.* at 55:24-56:9, 64:1-69:23.) After installing the space heaters, Rabbi Mykoff or Levinson adjusted the space heaters to the "on" position, but no power was supplied to the heaters because the circuit breakers in the synagogue sanctuary were switched to "off." (*Id.* at 70:6-25.)

Because Poile Zedek is an orthodox Jewish synagogue, neither its congregants nor Rabbi Mykoff could use light switches or electrical appliances on the Sabbath, which begins at sundown on Friday evening and extends until Saturday evening. (ECF No. 180-7, Belekin Tr. at 23:4-8; Mykoff Tr. at 256:15-18.) Consistent with these religious practices, the congregation had a procedure for turning on the power in the sanctuary for services on the Sabbath. (Belekin Tr. at 23:9-24.) Before sundown on Fridays, Sergei Belekin, the synagogue's caretaker, would turn the circuit breaker switches to the "on" position so that power would flow to the sanctuary. (*Id*. at 23:9-24:19.) Belekin would thereafter go to the basement to set a clock timer, which would cut the power to the sanctuary from Friday evenings until 8:00 a.m. Saturday morning when the power would turn back on in the sanctuary for services. (*Id.* at 23:9-24; Mykoff Tr. 75:7-76:6 .)

On the date of the fire, Belekin arrived at the synagogue, brought in bread for services the next day, and read the paper in the basement. (Belekin Tr. at 34:19-35:9, 37:15-38:4.) After hearing several loud "bam" noises, Belekin went upstairs to the sanctuary and witnessed a fire "near the bimah, near the table on the right side." (*See id.* at 38:12-41:11.) Belekin testified that he could not see the space heaters because of the smoke and fire but observed the fire for about three to four seconds. (*Id.* at 38:10-42:21.) After Belekin called 911, emergency services arrived and instructed Belekin to leave the basement of the synagogue immediately. (*Id.* at 39:15-40:10.)

After the fire, Rabbi Mykoff, Belekin, and a congregant Yakov Burr testified that several members of the Congregation, including themselves, had access to and removed items from the

fire scene. (*See generally* Mykoff Tr. at 137:15-16, 152:7-153:9, Belekin Tr. at 42:22-43:4, ECF No. 180-8, Burr Tr. at 61:18-64:3.) Approximately a week after the fire, Burr and Rabbi Mykoff visited the fire scene to "have a look inside the burned building." (Burr Tr. at 62:3-19.) The rabbi and Burr also returned a second time, where they were accompanied by an investigator with "the federal government" who Burr testified that he thought was from the "consumer protection" agency. (*Id.* at 62:22-63:2.) Rabbi Mykoff testified that he did not observe anyone preserve any electrical outlets or extension cords from the fire scene. (Mykoff Tr. at 148:23-149:15.) However, he testified that a different space heater, not manufactured by Cuori, but later identified by the brand "Sunbeam," was found in the basement and was disposed of after the fire. (*Id.* at 151:16-155:9.) Rabbi Mykoff also testified that other "debris" was disposed of following the fire. (*Id.* at 152:2-6.)

The Congregation also conducted a funeral service for the burned Torah scroll at the fire scene. As Burr testified, in the Jewish religion, "when a [T]orah scroll is damaged or destroyed, it receives the same dignified final treatment that a human being receives when a human being dies." (Burr Tr. at 81:12-16.) Burr testified that the funeral was "highly publicized." (*Id.* at 81:17-23.) The funeral was held in front of the synagogue, and "numerous people at the gathering walked through the synagogue and observed the conditions inside, as well as outside the synagogue." (*Id.* at 81:24-82:2.) Rabbi Mykoff also testified to removing "some things," which included "religious articles." (Mykoff Tr. at 130:24-131:1, 158:24-159:2.)

The congregation ultimately decided to put the property up for sale as opposed to making repairs.[3] (ECF No. 180-5, Kammer Tr. at 51:15-16, 60:10-61:18.) The property was eventually

[3] According to Eric Kammer, the Congregation had no property insurance in place at the time of the fire. (Kammer Tr. at 149:7-12.)

sold in 2019 to be developed into apartment units. (*Id.* at 60:19-22, 60:6-7.) The property was sold against Rabbi Mykoff's wishes. (*Id.* at 61:4-5.)

*2. Middlesex County Fire Investigation*

On the same day as the fire, Detective Todd O'Malley of the Middlesex County Prosecutor's Office was contacted to investigate the fire. (ECF No. 180-4, O'Malley Tr. at 189.) O'Malley's investigation was conducted over a two-day period. (*Id.* at 193-194.) He was joined by two fire marshals, a detective from the New Brunswick Police Department, and a New Brunswick fire official. (*Id.* at 190.) O'Malley also interviewed Rabbi Mykoff and Sergei Belekin. (*Id.* at 190-191.)

O'Malley issued a report following his investigation. According to Detective O'Malley, there was no evidence of arson, the cause of the fire was undetermined, and the fire's area of origin was the right side of the Bimah. (*Id.* at 189.) O'Malley did not opine on the cause of the fire because it "could have been the outlet, it could have been the vented extension cord that was underneath the platform arcing, it could have been the timers failing, it could have been the switches [Belekin] manipulated manually every week for the timers to activate. There's a lot going on that I could never eliminate as a cause of the fire." (O'Malley Tr. at 81:6-16.)

O'Malley's report states that investigators were able to recover two "Sunbeam" oil filled space heaters from fire debris. (ECF No. 180-4 at 194.) The report states that, prior to the fire, these space heaters were located on the "first level on the front right and left sides of the Bimah." (*Id.* at 190, 194.)[4] O'Malley testified that the Sunbeam heaters were recovered from the scene along with "the boxes that they actually purchased them in." (O'Malley Tr. at 38:21-39:11.) Also

4 These space heaters were recovered from the basement. (*Id.*) O'Malley's report notes that, due to the fire, "[t]he entire Bimah had fallen into the basement," leaving a hole in the floor that was 25 feet in diameter. (*Id.* at 192.)

attached to his report is a one-page print out from Cuori's website that depicts photos of various Cuori-brand oil-filled space heaters. (ECF No. 180-4 at 217.) O'Malley could not explain why this information was included in his report when asked at his deposition. (*Id.* at 87:23-89:9 (testifying that he "may not have known exactly what type of space heater" he was dealing with but clarifying that "I wouldn't look up a different item knowing that I had a different item at the scene. That would be silly of me to do. So I don't know exactly why I would have had Cuori versus Sunbeam. I can't answer that question").) According to Rabbi Mykoff, the heaters involved in the fire were Cuori oil-filled space heaters and the congregation used a Sunbeam heater to heat the property "downstairs." (Mykoff Tr. at 26:24-27:12.) Rabbi Mykoff testified that two heaters were found in the basement, one of which was a Cuori and the other he believed "was not involved" in the fire. (*Id.* at 142:8-24.) He testified that after the fire, a second Cuori heater was found upstairs on the right side of the sanctuary floor. (*Id.* at 142:25-144:21.)

O'Malley also testified at his deposition that Dorfman was "invasive" and "very involved" during the fire investigation. (O'Malley Tr. at 41:11-42:15, 121:18-19.) ("Mr. Dorfman . . . was very professional but very invasive . . . he wasn't asking me to do anything jaded or against the law, but it was kind of like, you know, can you lean towards something versus not lean towards something? And my answer was no . . . It wasn't for lack of 100 phone calls and very involved in the investigation (sic)."). O'Malley testified that Dorfman specifically wanted O'Malley to "blame the heater for the fire." (*Id.* at 121:16-122:6.) O'Malley explained to Dorfman that he "would never even contemplate doing that" because, while the heater was a "potential[]" cause of the fire, he could not "factually support" that it was the actual cause. (*Id.* at 122:10-22.)

After this litigation ensued, on June 25, 2020, Rabbi Mykoff wrote a letter to the Middlesex County Prosecutor's Office voicing his concerns that "[i]f the factual errors in the 2017 [fire

investigation] report [were] not corrected, they [had] the potential to injure the Congregation in its effort to recover compensation for the loss of the building." (ECF 180-3 at 330.) Rabbi Mykoff stated that "[i]f the Prosecutor was so inclined . . . [it might] wish to issue an amended or revised arson investigation report with the same conclusion, but more accurate background information." (*Id.*) Some of the suggested findings included a revision that "[t]he heaters are semi-filled with waste automotive crankcase oil" that is "more volatile than new petroleum oil," that the heater "flew like a rocket through the air," and that Detective O'Malley misunderstood Belekin due to Belekin's "poor English language ability." (*Id.* at 331, 332.)

*3. Chain of Custody and Testing of Space Heaters*

Following the fire, Rabbi Mykoff testified—without specifying a brand or type—that space heaters were at some point removed from the synagogue. (Mykoff Tr. 136:14-22.) Rabbi Mykoff did not personally remove the space heaters, but rather Dorfman notified him "of their removal." (*Id.* at 136:14-137:5.) Rabbi Mykoff believed that the heaters were placed in Dorfman's "storage room" or "storage place," which was in Dorfman's backyard. (*Id.* at 137:17-138:15.) According to Eric Kammer, a volunteer with the synagogue, he believed that after the fire, the space heaters were locked in a facility called Edison Lockup, a local facility rented by the synagogue. (*See* ECF No. 180-5, Kammer Tr. at 72:4-19.) From there, Kammer testified that he thought the heaters were stored in a facility called "Fresco [Ferasco]." (*Id.* at 72:16-17.)

At some point in time, the space heaters made their way into Rabbi Mykoff's possession so that they could be inspected by attorneys. (Mykoff Tr. at 139:4-12.) After the inspection, Rabbi Mykoff testified that the heaters were "possibly" taken downstairs to his basement, which housed "several" heaters: the two heaters purportedly involved in the fire "plus another one, plus a sample." (*Id.* at 149:16-150:4.) Rabbi Mykoff testified that the sample was "[t]he same brand

[Cuori] . . . but a later model." (*Id.* at 150:14-15.) Rabbi Mykoff testified that these space heaters were then transferred from his basement to his attorney. (*Id.* at 149:16-150:15.) He further testified that there was a fourth space heater found in the synagogue basement, a Sunbeam space heater, but that it "was not relevant to the situation . . . . [a]nd therefore, it most probably went out and was disposed of[.]" (*Id.* at 151:16-152:25.) Rabbi Mykoff testified that about a week after the fire, he personally determined that the Sunbeam heater was irrelevant and should not be saved. (*Id.* at 155:15-23.)

Rabbi Mykoff also testified that there was a "possibility" that there was another inspection of the space heaters before July 2019 that he "suspect[ed]" took place in Maryland. (*Id.* at 228:15-229:24.) Rabbi Mykoff testified that he "guess[ed]" that the Maryland facility was selected by himself and Dorfman, and that no one from the congregation attended the inspection. (*Id.* at 231:16-232:8.) Rabbi Mykoff confirmed that one of the Cuori heaters was inspected, but that he did not know what happened to the space heater during the inspection. (*Id.* at 232:9-25.) He also testified that he was unable to identify anyone other than potentially an associate of Dorfman's who had knowledge of this inspection. (*Id.* at 232:13-22.) He further testified that he was not sure if anything else (such as a box, manual, or cord) was sent along with the heater to the inspection, and he did not know if he was sent x-rays after the inspection. (*Id.* at 232:9-233:23.) Rabbi Mykoff was unsure where the space heaters were sent after they came back from Maryland, but he "presume[d]" they were sent back to Dorfman. (*Id.* at 233:9-12.)

At some point in 2021, the space heaters were moved to Rutgers University for testing by Dr. Dale Alexander, one of the experts in this case. (ECF No. 181-3 at 1.) And, in 2023, the heaters were returned to Ferasco. (*See* ECF No. 242 at 97:12-17.)

### B. Procedural Background

On November 3, 2017, Rabbi Mykoff filed a *pro se* Complaint in the United States District Court for the Southern District of New York. (ECF No. 1.) Rabbi Mykoff filed a First Amended Complaint on June 27, 2018 (also in the Southern District of New York), naming Home Depot, Inc., Cuori, Philadelphia Insurance Companies, Intertek, Inc., and Does 1-99. (ECF No. 14.) On August 13, 2018, the matter was transferred to this Court. (ECF No. 23.) On January 9, 2019, Rabbi Mykoff and Poile Zedek Congregation, Inc., now having retained counsel, filed a Second Amended Complaint. (ECF No. 31.) Poile Zedek Congregation, Inc. is the sole remaining Plaintiff, asserting a products liability claim (Count One) and a consumer fraud claim (Count Two) against Home Depot, Inc., the sole remaining Defendant. (*Id.*; ECF No. 120)

### C. Motions to Exclude Experts

Home Depot challenges the admissibility of three of Plaintiff's experts: (1) Dr. Dale Alexander, a metallurgist expert; (2) Kenneth Kandrac, a cause and origin expert; and (3) Gene Bullington, a products liability expert. (*See* ECF Nos. 181-83.) Plaintiff challenges the admissibility of certain opinions issued by Defendant's cause and origin expert, Richard Regenthal. (ECF No. 179.)

#### *1. Dr. Dale Alexander, PhD, P.E.*

Plaintiff retained Dale Alexander, an experienced materials/metallurgical consultant, to evaluate the space heaters for evidence of electrical activity. (ECF No. 181-4 at 1-2.) According to Plaintiff, Alexander's report "is intended to provide direct evidence of the role of one of the two space heaters in the Synagogue fire." (ECF No. 185 at 12.)

Alexander is a Principal and Senior Director at Engineering Systems, Inc. ("ESi") and authored two reports: (1) a summary report dated January 10, 2021, and (2) a final report dated March 8, 2024. (ECF No. 181-4 at 23; *see generally* ECF Nos. 181-3, 181-4.) Alexander attended

the inspection at Rutgers University of two oil-filled heaters and their corresponding components that were retrieved from the fire scene. (ECF No. 181-4 at 1.) In addition to a visual inspection of the heaters, Alexander also examined some of their contents with a stereomicroscope and conducted further analytical testing of certain items from "heater Evidence #2" using Energy Dispersive X-ray Fluorescence (EDXRF) spectroscopy. (*Id.*) EDXRF is used to analyze the chemical elements present in a sample. (*Id.*) Based on his visual inspection, Alexander opined that "[p]ieces of wire from both heaters [] exhibited areas of smooth spherical and semi-spherical macroscopic morphologies consistent with their formation due to electrical arcing," a conclusion he states was informed by relevant National Fire Protection Association (NFPA) guidelines on electrical arcing.[5] (*Id.* at 2-3, 9 (citing NFPA 921, A Guide for Fire and Explosion Investigations §§ 9.11.1-3).) According to Alexander, "[t]hese observations indicate that the heating unit was electrically energized by its connected outlet at the time of arcing." (*Id.* at 9.)

Alexander explained in his summary report that heater Evidence #3 exhibited less fire damage than heater Evidence #2. (*Id.*) His EDXRF analysis revealed that the spherical and semi-spherical formations were composed of copper-rich material, and Alexander opined that these formations occurred due to electrical arcing. (*Id.*) Alexander explained that "[c]opper wiring used in these heaters typically will not melt at the elevated ambient temperatures experienced in fires, a fact evidenced by the multiple sections of wire in both heating units that did not melt." (*Id.*) However, Alexander opined that "[c]opper will melt as a result of electrical arcing and/or if a metallurgical phenomenon, eutectic melting, is operative." (*Id.*) Eutetic melting "involves the intermixing (alloying) of other metals (e.g., zinc) with copper that results in a lower

[5] Alexander defines "arcing" as "the electrical breakdown of air caused by uncontrolled current flow through air between conductive materials at different voltages." *Id.*

melting temperature of the metal mixture." (*Id.*) Alexander explained that "[a]nother possible reason for copper conductors melting in a fire other than by electrical arcing, is metal alloying," also called "eutectic melting." (*Id.* at 3.) He noted that "eutectic melting could not be ruled out" in part because further metallurgical lab work proposed by ESi "was objected to by Home Depot and therefore not performed." (*Id.* at 3-5.)

*2. Battalion Chief Kenneth A. Kandrac, C.F.I.*

Plaintiff retained Kenneth A. Kandrac, a retired battalion chief with North Hudson Regional Fire & Rescue in New Jersey to opine as to the cause and origin of the fire. (ECF No. 182-3 at 1-2; ECF No. 182-4 at 1-2, 26.) Kandrac is a Certified Fire Investigation Technician ("CFIT") and Certified Fire Investigator ("CFI") with the International Association of Arson Investigators. (ECF No. 182-4 at 27.) He served as a firefighter with the Union City Fire Department and then as a captain with the Union City Fire Department/North Hudson Regional Fire & Rescue. (*Id.* at 26.) As battalion chief and captain, Kandrac's responsibilities included determining the origin and cause of fires. (*Id.*) Kandrac prepared two reports in this case: a preliminary report dated January 11, 2022, and a final report dated January 26, 2024. (ECF Nos. 182-3 and 182-4.)

Kandrac opines "that the source of ignition for this fire was a failure of the Cuori oil-filled heater that had been plugged into an outlet on the right side of the Bimah," and that the cause of the fire was accidental. (ECF No. 182-4 at 7, 9.) He opined that the fire "originated within the synagogue at the Bimah," and that "Caretaker Belekin was able to see a well-established fire at the right side of the Bimah." (*Id.* at 8-9.) According to Kandrac, photographs from the fire scene "clearly show extensive fire involvement and charring of structural members, flooring and floor joist that were below the Bimah," and "clearly show[] investigators at the area of the right side of

the Bimah and an oil-filled heater." (ECF No. 182-4 at 7.) According to Kandrac, "This Cuori oil[-]filled heater fell over but remained within the sanctuary. This indicates that the area of origin was on the right side of the Bimah." (*Id.*)

Kandrac further opined that "the source of the ignition for this fire was a malfunction of [the] newly placed Cuori oil[-]filled space heaters" because "Belekin utilized duplex outlets on the Bimah numerous times before," and "the only difference was the addition of the Cuori oil[-]filled heater approximately one-and one-half hour prior." (ECF No. 182-4 at 8.)

Kandrac disagrees that a Sunbeam heater was involved in the fire because "[t]he Sunbeam space heaters were reportedly recovered in the lower section of the synagogue" and they showed "damage to one end only." (*Id.* at 3.) Kandrac also considered alternate hypotheses of fire origins, and that "[s]everal potential ignition sources were considered, such as open flame from a candle or component failure of another electrical device." (*Id.* at 8-9.) He ultimately opined that "[t]he burn patterns were inconsistent with a source other than that identified in this report." (*Id.* at 9.) When asked at the *Daubert* hearing whether he considered the synagogue's use of a timer as a potential ignition source, Kandrac testified that he did consider the timer along with other "electrical devices" during his investigation and ruled them out. (ECF No. 242 at 124:3-6, 133:15-23, 143:13-20.) He also rejected the theory that the outlet or electrical supply to the bimah was the cause because the synagogue had previously used the outlet without any issues. (ECF No. 182-4 at 7; *see also id.* at 8 ("There is no indication that the outlet had caused problems or did not work at that time. This would exclude an electric fire resulting from a failure of the permanent electric supply in the wiring at the Bimah."). Finally, Kandrac ruled out the extension cords as a cause of the fire based on the fire patterns. (ECF No. 242 at 149:19-150:9.) He also testified that the

Sunbeam heater was not the cause of the fire because it was too "remote from the fire area," based on the photographs contained in his report. (*Id.* at 151:6-154:9.)

Kandrac's investigation was conducted in accordance with chapters 4, 5, 6, 17, and 18 of NFPA 921 (2014 Edition), NFPA 1033 Standard for Professional Qualification for Fire Investigator (2014 Edition),[6] and the American Society for Testing and Materials (ASTM E678-07). (ECF No. 182-4 at 1.) He testified that he visited the fire scene on January 11, 2019, to conduct his cause and origin investigation. (ECF No. 242 at 23:22-24:6.) As part of his investigation, Kandrac testified that he took photographs, measurements, and notes. (*Id.* at 123:23-124:3.) His expert report lists a number of documents that he considered as part of his investigation, such as the New Brunswick Police and Middlesex County Prosecutor's fire investigation reports, consumer product safety information, photographs, and deposition testimony. (ECF No. 182-3 at 4-6; ECF No. 182-4 at 5-6.) Kandrac also examined the remains of the space heaters at Ferasco and attended the EDXRF analysis of the space heaters when they were tested at Rutgers University. (ECF No. 182-4 at 6, *see also* ECF No. 187 at 6.)

*3. Gene Bullington, C.F.E.I., C.F.I.I.*

Plaintiff retained Gene Bullington as its products liability expert. (ECF No. 183-3.) Bullington conducted electrical failure analysis with the U.S. Navy, and he has worked in the field

---

6 During the *Daubert* hearing, the Court sought clarification from Plaintiff's counsel regarding which edition of NFPA 921 Kandrac relied upon in forming his cause and origin opinion. (*See* ECF No. 242 at 127:24-138:2.) Counsel for Home Depot stated that the parties stipulated to the 2021 edition of the NFPA, and counsel for Plaintiff stated that Kandrac's investigation was conducted pursuant to the 2014 edition. (*Id.* at 128:7-25.) Kandrac testified that he was familiar with both NFPA 2014 and 2021, that there were not material differences between the two versions, and that "the scientific method has been the same since ASTM back in 1980." (*Id.* at 129:22-130:10.) Kandrac further testified that he used the 2014 edition of NFPA 921 because it was the current edition of the NFPA in place when he inspected the fire scene in 2019. (*Id.* at 130:11-18.) Given the date of Kandrac's inspection, the Court will evaluate his methodology in accordance with the standards of the 2014 edition of NFPA 921.

for approximately 53 years. (ECF 242 at 12:9-12.) He is a Certified Forensic Consultant through the American College of Forensic Examiners. (ECF No. 179-7 at 8, 80.) He is also a certified Fire Investigator and a Certified Fire and Explosion Investigator through the National Association of Fire Investigators. (*Id.* at 8.) Bullington has an associate's degree in Police Administration from St. Petersburg Junior College and a bachelor's degree in Social and Behavior Science from the University of South Florida. (*Id.* at 6.) He has provided deposition and/or trial testimony in at least 33 matters in various state and federal courts. (ECF No. 179-7 at 4-6, 83-86.)

As a forensic analyst, Bullington has experience evaluating the causes of electrical fires and has specific knowledge concerning the failure mechanisms and manufacturing history of oil-filled radiator heaters. (*Id.* at 8.) Bullington has conducted approximately 20 investigations in cases that proceeded to litigation involving oil-filled heaters that caused or were involved in fires. (ECF No. 179-7 at 83-86; ECF No. 242 at 19:10-24.) In 1989, Bullington began examining exemplars oil-filled space heaters to determine a mode of failure analysis and has examined approximately 500 heaters since that time. (*Id.* at 20:3-12.) According to Bullington, he "was the lead research investigator . . . involving . . . product liability issues associated with oil-filled radiator heaters manufactured in the time period of 1980-2018." (ECF No. 179-7 at 8.)

As part of his investigation in this case, Bullington reviewed information provided by Home Depot concerning claims of space heater malfunctions, published literature concerning failures and fires in oil-filled radiator heaters, Consumer Product Safety Commission ("CPSC") recall information involving oil-filled radiator heaters, and online product reviews. (*Id.* at 12, 71, 94-108.) Bullington's report included a detailed discussion of each of the components of oil-filled radiator heaters manufactured from 1980 through 2018, which included "details of changes made in the components with information concerning the effect, if any, of the changes in the failure rate

of the components." (*Id.* at 14.) The specific components discussed in Mr. Bullington's report were listed as: 1) metal case; 2) leaking heater; 3) thermal oil; 4) heating element; 5) switches; 6) thermostat; 7) wiring (internal); 8) tip-over switches; 9) auto-resetting high temperature limit; 10) thermal fuse; 11) cord and plug sets; and 12) instruction manual. (*Id.* at 14-42.)

Bullington's investigation into the Cuori oil-filled space heaters involved in the fire included examining exemplar heaters to compare them with the subject heaters, as well as examining the exemplars "for potential impending failures." (*Id.* at 12.) According to Bullington, an "exemplar" is defined as "a substantially similar or identical item as what you think may have or what somebody has alleged was involved in the cause of a fire." (ECF No. 242 at 29:10-16.) Although his report did not identify the exemplars that he considered and noted that one exemplar may have been of a different model, he concluded that the exemplars were the same or substantially similar to the subject heaters based on a review of the component parts. (ECF No. 183-3 at 1, 12, 45.) At the *Daubert* hearing, Bullington confirmed that the exemplars were the same or substantially similar to the subject heaters based on their components. (*Id.* at 62:1-15.) However, Bullington conceded that he had no information regarding the history or prior use of the exemplars and that they were provided by counsel. (*Id.* at 61:15-20, 64:21-65:20.) He concluded that an examination of the exemplar heaters "revealed a number of potential problems within the exemplar heaters which could result in an electrical failure, electrical arcing, and/or fire, and thus potentially cause property damage, personal injury, and death." (ECF No. 183-3 at 13.)

Bullington issued a number of relevant findings in his report. He opined that Home Depot, from information known to it in the form of other similar incidents, knew "that the metal heater vessel of an oil-filled radiator heater could rupture which could result in a fire or worsening of a fire." (ECF No. 183-3: at 72.) He further opined that the Cuori exemplars he investigated revealed

that "[t]he thickness of the metal used in the heater vessel was less than industry standard"; that "[t]he heaters exhibited internal wiring defects which could result in electrical arcing"; and that "[p]lugs on some heaters exhibited evidence of overheating due to a defect in the electrical service cord plug prong connection." (*Id.* at 72.) Finally, Bullington opined that "[I]t is a reasonable expectation of the purchaser of an oil-filled radiator heater that it be manufactured in such a way as to not cause or contribute to a fire in normal circumstances." (*Id.* at 74.) He opined that the subject heaters used by Poile Zedek synagogue failed to meet this expectation. (*Id.*)

*4. Richard F. Regenthal, P.E.*

Home Depot retained Richard Regenthal, an electrical engineer, to opine as to the damage to the synagogue and its contents, as well as to rebut/challenge the conclusions of Plaintiff's metallurgical and cause and origin experts. (*See* ECF No. 189-3.)

Regenthal issued two expert reports, one dated April 29, 2022 and another dated May 8, 2024. (ECF Nos. 183-3, 189-4.) In issuing his first report, he reviewed material in the record regarding the fire, such as fire scene photographs, deposition transcripts, the New Brunswick Fire Department Report and the Middlesex County Prosecutor's Office file. (ECF No. 189-3 at 1, 2.) He also attended laboratory inspections of the space heaters in November 2020 and December 2021. (*Id.* at 1.) He did not visit the fire scene.

Regenthal opined that there exists insufficient evidence to determine that the subject oil-filled heaters were the cause of the fire at the synagogue. (ECF No. 189-4 at 14.) Regenthal opined that based on photographs of the bimah, which collapsed onto the floor below, "it can be concluded that building wiring and devices (such as recessed outlet boxes) existed within the void between the Bimah and the ceiling below." (*Id.* at 15.) According to Regenthal, "[a] failure of this wiring could have ignited the wood floor structure and caused a fire which would have burned freely within this space undetected, until it burned through the floor of the Bimah and compromised

the ceiling below." (*Id.*) He further opined that "[a] fire on the main sanctuary floor, in the area of one of the oil-filled heaters, would have compromised the main sanctuary floor. The fact that the Bimah, and not the surrounding floor structure, collapsed is another indication that a fire may have ignited in the void between the Bimah and the ceiling below." (*Id.*) Regenthal concluded that this theory "would also account for why no evidence of electrical activity was observed within the heaters, as the circuit powering them would have been compromised." (*Id.*) Given that no "private investigation of the site was . . . conducted in a manner that would have explored this prior to the demolition of the structure," Regenthal concluded that all possible sources of ignition were not considered, and that "there is no evidence that either of the two Cuori oil-filled heaters . . . were the cause of the subject fire." (*Id.*)

During the *Daubert* hearing, Regenthal clarified his role as a rebuttal expert,[7] and testified that he was not offering an opinion with regard to the specific ignition mechanism within the void of the bimah, because he was unable to examine the scene, the photographs did not demonstrate what was inside of the bimah, and because nothing else but the heaters were collected as evidence. (*Id.* at 80:22-81:7.) Instead, he testified that there were several other potential causes that were required to be investigated under NFPA 921, but were not considered by Plaintiff's expert,

7 During the *Daubert* hearing, counsel for Plaintiff objected to Regenthal's testimony on the basis that his expert report did not contain an opinion exonerating the space heaters as a cause of the fire. (ECF No. 242 at 85:4-6.) After exploring this issue with counsel for both parties, the Court confirmed the following: 1) Regenthal's opinion that the space heater did not cause the fire was based on his opinions that the space heater exhibited evidence of melting and not arcing, and that there were other potential causes of the fire that were not explored by Plaintiff's experts, (*see* ECF No. 242 at 91:12-92:7, 99:6-101:4; ECF No. 189-4 at 11); and 2) although Regenthal opines that the fire *may* have started under the bimah, within it, or within the area, he is *not* offering an expert opinion that the fire in this case *started* inside the bimah or was caused by something inside the bimah, (*see* ECF No. 95:21-96:6.)

Kandrac, such as the fire originating within the bimah, the fire being caused by circuits or extension cords, or timers on the electrical outlets. (*Id.* at 84:11-24, 95:16-96:15.)

As to his opinions that the subject heaters did not cause the fire, Regenthal testified that "plaintiff experts seem to have fixated on this heater, which, again, is contrary to NFPA 921." (*Id.* at 84:22-24.) Nevertheless, Regenthal testified that upon his examination of the subject heaters, he "found that the space heater interior and the exterior was consistent with the fire being exposed to a tremendous fire." (*Id.* at 86:24-87:3.) Regenthal based his conclusion upon finding "dozens of small wires that were within the fully enclosed metal compartment of the electrical heater . . . which is extremely consistent with being exposed to temperatures in excess of their melting temperature." (*Id.* at 87:4-11.) Regenthal further testified that NFPA 921, particularly Section 9, "calls out how melting is described, and one of the very specific things you look for is melting is almost uniformly consistent with large portions of the wire." (*Id.* at 86:12-15.) Noting that NFPA 921 requires an investigator to consider alternative causes of a fire, Regenthal testified that he tested the hypothesis of one of the heaters as being the source of the fire, but that it "does not stand up to testing because the fire patterns within the church or structure were not centered around the space heater." (*Id.* at 87:24-88:3.)

As to his investigation into the subject heaters, Regenthal explained that the two heaters that underwent laboratory inspection appeared to be identical. (ECF No. 189-3 at 9.) He explained that neither heater was identified as to which side they allegedly occupied prior to the fire. (*Id.*) Regenthal opined that "Heater #2 . . . was found heavily oxidized and appeared to have been exposed to extreme heat." (*Id.*) He noted that "most of the wiring was melted away with only small segments of internal wiring remaining," and that no sign of electrical activity was observed. (*Id.*) He catalogued specific components of the heater an explained that "[o]ne area of the oil-

filled heater was found bulged. This area exhibited signs of overpressure, which caused the metal components to separate and vent the interior oil." (*Id.* at 10.) As to Heater #1, he opined that it was "found moderately oxidized and appeared to have been exposed to moderate to high heat" and "that most of the wiring was still in place." (*Id.*) Regenthal further explained that "[n]o sign of electrical activity was observed on any of the internal wiring" (*Id.*)

Regenthal noted that "[a]n arc severed wire occurs typically at one localized location. Upon separation of the wire, electrical current ceases in the reminder of the wiring within that circuit. As the subject heaters contain a single circuit, such severing of the wire would cease all current flow within the heater. However, these heaters contained many severed wires which is typical with melting of the conductors and not arc severing." (ECF No. 189-4 at 11.)

Regenthal also rebutted the opinions of Alexander and Kandrac. According to Regenthal, Alexander only focused on the oil-filled heaters and did not consider other alternative causes of the fire, "such as other electric portable heaters, building wiring/devices, extension cords, timers, etc. which were not collected as evidence." (*Id.* at 11; ECF No. 189-3 at 12.) Regenthal challenged Alexander's conclusion that the copper wiring showed evidence of electrical arcing, and instead opined that the wiring was "melted and not arc severed" based on NFPA 921. (ECF No. 189-4 at 11; ECF No. 189-3 at 14.) Regenthal opined that alloying was evident in some of the examples cited in Mr. Alexander's report, which he stated again indicates that the wires within the examined heaters were severed via melting and not arcing. (ECF No. 189-3 at 14.)

As to Kandrac, Regenthal opined that his conclusion that the Cuori space heaters were the cause of the fire were based solely on Alexander's conclusions. (*Id.* at 15.) In particular, he opined that Kandrac concluded that there was arc-parting of wiring observed within the oil-filled heater and that copper does not melt at temperatures associated with a fire based solely on Alexander's

report. (*Id.* at 15.) Regenthal further opined that "[t]here was no follow-up site investigation performed to determine the exact area of origin of the subject fire. Mr. Kandrac relies solely on pictures and a report issued by the Middlesex County Prosecutor's Office which concluded only that the fire was accidental and may have started in the area of the Bimah." (*Id.* at 16.) He also challenged Belekin's eyewitness observations of the fire and concludes that Kandrac's reliance on them "are not based in any facts to a reasonable degree of scientific certainty." (*Id.*) He further opined that the synagogue did not follow the instructions located in the instruction manual for the heaters, and he concluded that wiring contained beneath the bimah "could have ignited the wood floor structure and caused a fire which would have burned freely within this space undetected, until it burned through the floor of the Bimah." (*Id.* at 19.)

Regenthal's second report also challenged Bullington's findings. (ECF No. 189-4 at 6-7.) Based on his knowledge and expertise, he challenged and rebutted Bullington's conclusions, largely pointing to alternate causes and challenging the relevance of his conclusions. (*Id.*) He opined that while he agreed "that there is a reasonable expectation that the purchase of any electrical appliance will not cause a fire when used as directed," he explained that he "observed no evidence of an internal electrical failure other than severe damage caused by the heaters being exposed to an external intense fire." (*Id.* at 10.) Regenthal thus concluded that "Mr. Alexander, Mr. Bullington and Chief Kandrac failed to consider any other possible causes for the subject fire as required by the scientific method prescribed by NFPA 921." (*Id.* at 14.)

## II. LEGAL STANDARD

### A. *Daubert* Standard

Under Rule 702,[8] "[d]istrict courts are tasked with a 'rigorous gatekeeping function,'" to ensure that expert testimony is both relevant and reliable. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)). Notwithstanding, "Rule 702 . . . has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997)). Expert testimony will be admissible if: (1) "the expert is qualified"; (2) "the proposed testimony is reliable and concerns matters requiring scientific, technical, or specialized knowledge"; and (3) "the expert's testimony is 'sufficiently tied to the facts of the case,' . . . so that it 'fit[s]' the dispute and 'will assist the trier of fact[.]'" *Cohen*, 125 F.4th at 460 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591(1993)). The party proposing the expert testimony must show that each prong is satisfied by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

#### *1. Prong One – Qualification*

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The basis for this specialized expertise "can be practical experience as well as academic training and credentials."

---

[8] In 2023, Rule 702 was "amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee note to 2023 amendment (citing Fed. R. Evid. 104(a)). "Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702." *Id.* "Since the amendments, courts have consistently concluded . . . that the amendments 'did not substantively change the relevant [Rule 702] standard.'" *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, Civ. No. 16-2738, 2026 WL 161184, at *11 (D.N.J. Jan. 20, 2026) (quoting *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 n.8 (Fed. Cir. 2025)) (collecting cases).

*Elcock*, 233 F.3d at 741 (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). While courts have interpreted the special expertise requirement "liberally," "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id*. (quoting *Waldorf*, 142 F.3d at 625). Importantly, however, an expert does not have to "be the best qualified" or "have the specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244 (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir.1996)).

*2. Prong Two – Reliability*

The "reliability requirement ensures that an expert's testimony is 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" *Cohen*, 125 F.4th at 461-62 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). However, "admissibility does not hinge on 'whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.'" *Id.* at 462 (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)). Rather, courts look to whether the expert's testimony is supported by "good grounds." *Id.* (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020)). Courts apply this good grounds analysis to "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

As the Third Circuit recently reiterated, "there is no 'definitive checklist or test,'" for courts to employ when analyzing what constitutes "good grounds." *Cohen*, 125 F.4th at 462 (quoting *Daubert*, 509 U.S. at 593). However, courts should assess the following "important" factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of

> standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.
>
> [*In re Paoli*, 35 F.3d at 742 & n.8 (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)).]

*See Cohen*, 125 F.4th at 462 (noting that "some analysis of these factors is necessary" (quoting *UGI Sunbury*, 949 F.3d at 834)).

If good grounds are shown, an expert's testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

In cases where an expert's testimony is based upon practical experience, the good grounds factors "such as peer review, publication, potential error rate, (among others), are not applicable because the reliability of testimony from a practical experience expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind" their opinion. *Smith v. State Farm Fire & Cas. Co.*, Civ. No. 19-10319, 2023 WL 3561406, at *3 (D.N.J. May 19, 2023) (quoting *Christoforetti v. Bally's Park Place, Inc.*, Civ. No. 124687, 2021 WL 3879074 at *4 (D.N.J. Aug. 30, 2021)). As a result, "the fact that an expert does not use a scientific or 'testable' theory or methodology that can be examined by peer review, does not render an expert's testimony unreliable under Rule 702." *Smith*, 2023 WL 3561406, at *3 (quoting *Christoforetti*, 2021 WL 3879074 at *7.)

*3. Prong Three – Fit*

"The third prong of admissibility, fit, concerns whether the expert's testimony will be helpful to the trier of fact." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 132 (D.N.J. 2020) (citing Fed. R. Evid. 702(a)). The Third Circuit has explained that "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *In re Paoli*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237). "Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand." *Geiss v. Target Corp.*, Civ. No. 09-2208, 2013 WL 4675377, at *5 (D.N.J. Aug. 30, 2013) (citing *United States v. Ford*, 481 F.3d 215, 220 n.6 (3d Cir. 2007)). "Whether an expert's testimony meets the fit requirement 'is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, 509 F. Supp. 3d at 132 (quoting *In re Paoli*, 35 F.3d at 743).

**B. Spoliation**

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably for[e]seeable litigation." *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Spoliation occurs where: (1) "the evidence was in the party's control"; (2) "the evidence is relevant to the claims or defenses in the case"; (3) "there has been actual suppression or withholding of evidence"; and (4) "the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995)). The burden is on the party seeking a spoliation sanction to establish each element. *Neal v. Powell*, Civ. No. 17-4768, 2024 WL 3466800, at *3 (D.N.J. July 19, 2024)

(citing *McCann v. Kennedy Univ. Hosp., Inc.*, Civ. No. 12-1535, 2014 WL 282693, at *4 (D.N.J. Jan. 24, 2014)).

"To provide redress to the party harmed by spoliation, as well as to punish the spoliator, a court may impose appropriate sanctions pursuant to the Federal Rules of Civil Procedure and the court's inherent powers." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 519 (D.N.J. 2008) (citations omitted). Spoliation sanctions serve (1) "a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation"; (2) "a punitive function, by punishing the spoliator for its actions; and (3) "a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be." *Est. of Tattoli v. Home Depot U.S.A., Inc.*, Civ. No. 22-6570, 2025 WL 1837567, at *2 (D.N.J. July 3, 2025) (quoting *Mosaid Techs. Inc.*, 348 F. Supp. 2d at 335). "Sanctions can include dismissal of a claim or defense, suppression of evidence, an adverse inference, fines, and/or an award of attorneys' fees and costs. *United States for Use of Colorado Custom Rock Corp. v. G&C Fab-Con, LLC*, Civ. No. 20-2968, 2023 WL 3212516, at *6 (D.N.J. May 2, 2023) (citing *Kounelis*, 529 F. Supp. 2d at 519). "A dispositive sanction is warranted only where 'the non-responsible party's case is severely impaired because it lacked the information that was not produced.'" *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Bull*, 665 F.3d at 83).

"An adverse inference for spoliation of evidence, or a spoliation inference, 'permits a jury to infer that destroyed evidence might or would have been unfavorable to the position of the offending party.'" *Kounelis*, 529 F. Supp. 2d at 520 (quoting *Mosaid Tech. Inc.*, 348 F. Supp. 2d at 336). Deemed a "remedial" "permissive inference," the spoliation inference "is predicated on the 'common sense observation' that when a party to an adversarial proceeding destroys relevant

evidence it is likely done out of fear that the evidence would be harmful to that party." *Kounelis*, 529 F. Supp. 2d at 518 (quoting *Mosaid Tech. Inc.*, 348 F. Supp. 2d at 336).

## III. DISCUSSION

### A. Motions to Exclude Experts

#### *1. Dr. Dale Alexander*

Home Depot argues that Alexander's opinion that the subject heaters showed signs of electrical arcing is inadmissible because he failed to cite any studies or authoritative sources that would support his visual observations. (ECF No. 181-2 at 7.) Thus, Home Depot submits that Alexander lacked "the facts and data he needed" to reliably opine as to the cause of the fire. (*Id.* at 9.) Home Depot further argues that Alexander used an unreliable methodology because he did not follow NFPA 921, "which is the tested, peer-reviewed methodology for conducting fire investigations," and that he only cited to the NFPA in his final report and not his preliminary report. (*Id.* at 4, 9.) The Court finds Home Depot's arguments unavailing.

Alexander's opinions were "based on the methods and procedures of science," rather than subjective belief and speculation. *Karlo*, 849 F.3d at 80-81. He undertook a visual inspection of the subject heaters and their component parts, which is a recognized methodology in NFPA 921 when determining electrical arcing versus melting by fire. (ECF No. 181-4 at 3-4; *see also* ECF No. 181-3 at 2); see also National Fire Protection Association 921, A Guide for Fire and Explosion Investigations (2021 ed.) (hereinafter NFPA) § 9.11 ("Visual examination can provide reliable identification of damage from electrical arcing and melting by fire. . . ."); *see also Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 501 (D.N.J. 2002) (holding that "reliance on visual or tactile inspection and [an expert's] own specialized expertise" was "sufficiently reliable in light of the nature of the issue on which he propose[d] to opine, the relatively narrow scope of his testimony, and his particular field of expertise").

Alexander also conducted an EDXRF analysis, a method specifically endorsed by the NFPA, to reveal the copper-rich content of the heaters' component parts. (ECF No. 181-3 at 1-2, 4; see ECF No. 185 at 20); *see also* NFPA § 9.11.3 ("Alloying is very easily identifiable by use of Scanning Electron Microscope and Energy Dispersive X-Ray Spectometer. . . ."); *Id.* § 9.11 ("[X]-ray . . . or other metallurgical method could assist in discerning between damage by electrical arcing and melting by fire."). As noted by Alexander, "[c]opper wiring used in these heaters typically will not melt at the elevated ambient temperatures experienced in fires," but will melt because of electrical arcing. (ECF No. 181-4 at 9.) Alexander relied on NFPA 921, section 9.11.1 (Melting Caused by Electrical Arcing) to conclude that multiple wire pieces from the subject heaters, reviewed macroscopically and microscopically with a stereomicroscope, demonstrated traits of electrical arcing consistent with NFPA guidance. (ECF No. 181-4 at 2-4.) He also relied on NFPA 921, section 9.11.2, which identifies the commonly exhibited traits for fire-melted conductors, to opine that the wire pieces did not exhibit traits consistent with melted conductors. (ECF No. 181-4 at 2-3.)

Home Depot relies on *State Farm Fire & Casualty Co.*, where the court declined to consider a fire causation expert's opinion based on the expert's failure to properly adhere to the standards set forth in NFPA 921. 948 F. Supp. 2d 434, 446 (E.D.Pa. 2013); (ECF No. 181-2 at 6-8, 11-12.) There, the court found that, in rendering his causation opinion, the expert failed to consider all available evidence and alternative hypotheses, a consideration required by NFPA 921, section 18. *See State Farm*, 948 F. Supp. 2d at 439-46. The court further held that the expert's opinions were "rooted in supposition" and tainted with expectation bias because the expert only performed a "limited analysis" of the data and his conclusions on the ignition source leapt beyond the available evidence. *Id.* at 442-44.

Home Depot argues that Alexander's opinions "suffer from the same deficiencies," as those of the expert in *State Farm*, because Alexander too failed to consider other causes of the fire and the evidence of melted wiring, thus compromising his opinions with expectation bias. (ECF No. 181-2 at 8-9, 11-12.) Such deficiencies, in a fire cause and origin investigation, may render an expert's opinion inadmissible, which the court in *State Farm* recognized. *Id.* at 437-446. However, Alexander was retained as a metallurgical expert and relied on Chapter 9 of the NFPA in connection with his investigation, which "discusses the analysis of electrical systems and equipment." *See* NFPA 921, § 9.1. As noted in his reports, Alexander's opinions are limited to "materials and metallurgical issues involved in [the] fire[.]" (*See generally* ECF Nos. 181-3 and 181-4.) As such, Home Depot's argument that Alexander "did not consider any other causes of the fire" in connection with section 18.7 of the NFPA, (ECF No. 181-2 at 12) reflects a misplaced reliance on a chapter of the NFPA that is inapplicable to Alexander's role as a metallurgical expert. Thus, the Court need not evaluate Alexander's opinions, as a metallurgical expert, against sections of the NFPA regarding cause and origin determinations.

Home Depot's criticism that Alexander "did not address" Home Depot's expert Richard Regenthal's competing expert opinion is more appropriately addressed at trial. *See In re Gabapentin Patent Litig.*, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011) (holding that a disagreement between experts regarding application of a methodology presents "a battle of the experts" for the jury to decide). Nor do Home Depot's disagreements with Alexander's scientific conclusions render those conclusions inadmissible. *See Contel Glob. Mktg., Inc. v. Cotera*, Civ. No. 01-0238, 2015 WL 4508350, at *4 (D.N.J. July 24, 2015) ("Attacks on an expert's precise conclusions . . . are not grounds to render that testimony inadmissible." (citing *Daubert*, 509 U.S. at 594-95)).

Accordingly, the Court finds that Alexander's metallurgical and electrical arcing opinions satisfy Daubert's reliability prong. Alexander's use of inspection-based engineering and scientific metallurgical analysis support his conclusions that the copper wire pieces identified in the subject heaters were "more likely than not . . . formed because of electrical arcing." (*See generally* ECF No. 181-4.)

2. *Battalion Chief Kenneth A. Kandrac, C.F.I.*[9]

Home Depot seeks to exclude Kandrac's testimony on the basis of *Daubert*'s reliability prong. Home Depot argues that Kandrac's opinions were not based on sufficient facts and data because Poile Zedek failed to preserve the evidence Kandrac needed to rule out alternative causes of the fire. (ECF No. 182-2 at 5.) Home Depot argues that Kandrac relied extensively on photographs and reports prepared by the New Brunswick Police Department and Middlesex County Prosecutor's Office and his examination of the subject heaters, but failed to examine the timers, cords, or other heaters that were in use to provide a reliable opinion as to the cause of the fire. (*Id.* at 7.) Home Depot also argues that Kandrac cannot offer a causation opinion as he failed to consider alternative causes of the fire beyond the subject heaters, including the testimony of those with firsthand knowledge of the fire scene. (*Id.* at 7, 9-10.)

The Court finds no basis to exclude Kandrac's opinions as to the fire's cause and origin. Kandrac's opinions were reached following NFPA 921, the "gold standard" for fire investigations. *In re Soued*, 689 F. Supp. 3d 1, 12 (D.N.J. 2023) (citations omitted). According to NFPA 921, a fire investigator must follow the scientific method, which requires an investigator to: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4)

[9] As with Alexander, Home Depot does not challenge Kandrac's qualifications, which was confirmed by counsel for Home Depot at the *Daubert* hearing. (*See* ECF No. 242 at 122:17-24.) Accordingly, the Court need not address this reliability factor. Home Depot also does not challenge whether Kandrac's testimony will be helpful to a jury, so the Court does not address this factor.

analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. *Medina v. Daimler Trucks N. Am., LLC*, Civ. No. 10-623, 2014 WL 7405210, at *7 (D.N.J. Dec. 30, 2014); *see also* NFPA § 4.3 (2014 ed.) (outlining same). NFPA 921 provides that an investigator should examine the scene and collect data including "the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the result of scientific testing." *Smith v. Spectrum Brands, Inc.,* Civ. No. 21-4983, 2022 WL 3229330, at *4 (E.D. Pa. Aug. 10, 2022); *see also* NFPA § 4.3.2 (2014 ed.). Kandrac followed this method by examining what remained of the fire scene in 2019, reviewing the police and prosecutor's office's fire investigation reports, speaking with Detective O'Malley, and reviewing litigation materials such as Belekin's deposition transcript. (*See generally* ECF 182-4.) NFPA section 4.3.4 also permits an analysis of data "based on the knowledge, training, experience, and expertise of the individual doing the analysis." NFPA § 4.3.4 (2014 ed.). Further, "testing the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." *Id.* (internal quotations omitted); *see also* NFPA § 4.3.6 (2014 ed.).

Home Depot's objections to Kandrac's opinions reflect a disagreement with how Kandrac weighed the relevant evidence in reaching his conclusions, rather than the methods applied. Such disagreement does not provide a basis for exclusion under *Daubert*. For example, Home Depot objects to Kandrac's reliance on photographs and reports of the fire scene in opining on the cause of the fire, arguing that such materials "do not provide a sufficient factual basis for Kandrac to scientifically assess the cause of the subject fire." (ECF No. 182-2 at 3.) But such an objection is not a basis to exclude an opinion under *Daubert. Ford v. Ford Motor Co.*, 311 F. Supp. 3d 667, 677 (D.N.J. 2017) (denying a party's *Daubert* motion to exclude a fire causation expert and noting

that "[i]t seems obvious that a fire investigator would, in formulating his post-hoc opinion about the cause of a fire, look to the reports of responding investigators and their factual determinations, especially as it relates to other possible causes or origins of the fire"). Home Depot also disagrees with Kandrac's crediting of Belekin's deposition testimony in rendering his conclusions (and not considering additional testimony from Detective O'Malley and other synagogue officials), stating that Belekin "could not see where, specifically, the fire was burning because pews blocked his view." (*Id.* at 6-7). But, again, such a disagreement cannot support a basis to exclude testimony under *Daubert*. *Soued*, 689 F. Supp. 3d at 15 (noting that the party seeking to exclude a fire investigator's opinion "point[ed] to no case excluding a fire investigator's opinion on the origin and cause of a fire because the investigator relied on deposition testimony or discovery materials, such as surveillance footage," because the NFPA 921 "supports the use of such information"). Under *Daubert*'s reliability prong, the focus is on methodology rather than conclusions. *Milltown-Ford Ave. Redevelopment Agency v. SB Building Assocs., L.P.*, Civ No. 19-21494, 2024 WL 3690776, at *16 (D.N.J. Aug. 7, 2024) (citing *In re Paoli*, 35 F.3d at 742).

Home Depot largely faults Kandrac for having "failed to consider any potential causes of the fire other than the subject heaters." (*See* ECF No. 182-2 at 10-13.) However, this argument is contradicted by Kandrac's expert report, (*see* ECF No. 182-4 at 8 (stating that Kandrac considered "alternate hypotheses of fire origins, away from, or communicating to an area remote from, the immediate area of fire origin"), and his testimony at the *Daubert* hearing, where he testified that he considered several alternative causes to the fire, such as various utilities, open flame sources, and electrical devices such as timers. (ECF No. 242 at 137:9-145:14.) In any event, Kandrac is not required to test every possible alternative in rendering his cause and origin opinion. *See Homesite Ins. of Midwest v. Olson*, Civ. No. 18-12745, 2023 WL 2746282, at *7 (E.D. Mich. Mar. 31, 2023))

("[N]ot only does the law not require strict adherence to NFPA 921, the law does not require that [an investigator] test each and every possible cause of the subject fire."); *see also Allstate Ins. Co. v. Gonyo*, 2009 WL 1212481, at *6 (N.D.N.Y. Apr. 30, 2009) ("If there is any question that [the expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack."). Home Depot's criticism of Kandrac's opinions is more appropriate for cross-examination at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, the Court finds Kandrac's opinions sufficiently reliable.

*3. Gene Bullington, C.F.E.I., C.F.I.I.*

Home Depot seeks to exclude Bullington's expert testimony and argues that he lacks qualifications and his opinions are unreliable. The Court will address each challenge in turn.

*a. Qualifications*

Home Depot argues that Bullington is not qualified to opine as to any defects in this case because he is not an engineer, he has never designed a space heater or worked for a space heater manufacturer, nor has he published any articles related to space heater design or manufacture. (ECF No. 183-2 at 8.) In response, Plaintiff argues that Bullington is well qualified as he has participated in a "large number of education programs devoted to fire investigations" and since 1987 has conducted forensic analysis of "fire and explosion origin and cause determination[s]" as well as "the evaluation of defects in product manufacturing, design, installation and use." (ECF No. 186 at 13.) Plaintiff further notes that Bullington has evaluated hundreds of space heaters to determine whether their components were vulnerable to electrical fires, and, on two occasions, other federal courts have found Bullington qualified to testify in similar fire cases. (*Id.* at 13-14.)

The Court finds that Bullington is qualified to opine as to the electrical defects in the subject heaters. The requirement that a witness possess specialized expertise "can be practical experience as well as academic training and credentials." *Elcock*, 233 F.3d at 741 (quoting *Waldorf*, 142 F.3d at 625). Bullington completed Electronics School and Fire Control Technicians School through the U.S. Navy. (ECF No. 183-3 at 75.) As a Navy Fire Control Technician, he performed troubleshooting, repair, and design of electro-mechanical systems. (*Id.* at 79.) He received his "Electrical Fires – Causes, Investigation, Analysis and Prevention" certificate from the Hughes Institute. (*Id.* at 76.) Bullington completed course work involving electrical codes and failure analysis of non-metals. (*Id.* at 76-77.) He is also a Certified Forensic Consultant through the American College of Forensic Examiners, a Certified Fire and Explosion Investigator, as well as a Certified Fire Investigator Instructor through the National Association of Fire Investigators. (*Id.* at 8, 80.) As an electrical failure analyst, he has examined hundreds of heaters and heater control panels and served as an expert in approximately 20 cases involving oil-filled space heaters. (*See generally* ECF No. 183-3 at 2-5; ECF No. 242 at 20:3-12.) Bullington has been examining exemplar heaters since 1988, and was the lead research investigator in projects involving the product liability issues associated with oil-filled radiator heaters manufactured between 1980 to 2018. (*Id.* at 8, 11; ECF No. 242 at 20:3-12.)

The Court finds that Bullington's experience involving space heaters and their component parts qualifies him as someone who possesses the "skill or knowledge greater than the average layman," to testify as an expert in this case. *See Elcock*, 233 F.3d at 741 (quoting *Waldorf*, 142 F.3d at 625). The court in *Citizens Property Insurance Corporation v. Simkar LLC*, 813 F. Supp. 2d 1356, 1361 (M.D. Fla. 2011) made a similar finding regarding Bullington's qualifications. There, the defendant sought to exclude Bullington's opinion that a light fixture was the cause of a

fire on the grounds that Bullington is not an electrician or electrical engineer. *Id.* at 1359-61. The court rejected that argument and held that Bullington was qualified because he is a Certified Fire Investigator and has conducted over 5,000 fire investigations over twenty-seven years, including approximately twenty investigations in which he concluded that a fluorescent lighting fixture caused a fire. *Id.* at 1361. The court noted that Bullington has training "in electrical failure analysis from the U.S. Navy and other organizations" and "has testified as an expert at the state and federal level in determining the origin and cause of fires, electrical fire causes, and fire burn pattern analysis." *Id.* As the Third Circuit has recognized, "a broad range of knowledge, skills, and training qualify an expert as such." *Paoli*, 35 F.3d at 741.

The cases relied on by Home Depot are readily distinguishable. In *Surace v. Caterpillar, Inc.*, the Third Circuit found that an expert's testimony that a back-up alarm was defectively designed was inadmissible, despite the proffered expert having an electrical engineering degree and extensive experience in electrical and mechanical engineering. 111 F.3d 1039, 1055-56 (3d Cir. 1997). The expert was excluded because his testimony hinged on a theory called "habituation," a "phenomenon by which a person becomes immune to a particular stimulus through constant repetition and exposure." *Id.* at 1043, 1055. As an engineer, the expert had no training or experience with this psychological concept, and himself admitted that the sole basis for his opinions rested upon his reliance on the conclusions of a psychologist who was also retained in the case. *Id.* at 1055-56. Similarly, the expert in *Jones v. Synthes USA Sales, LLC*, who sought to offer testimony regarding how to manufacture biomaterials and surgical devices, was disqualified because 1) he was an aircraft engineer; 2) he had no education, training, or experience in medicine; and 3) he had never designed a medical device nor observed a surgical procedure. Civ. No. 08-2060, 2010 WL 3311840, at *7 (D.N.J. Aug. 19, 2010). The qualification issues raised

in *Surace* and *Jones* are not present here. Bullington's practical experience involving space heaters together with his specialized background in fire investigations and electrical failure analysis squarely fits within Rule 702's qualification standard. Accordingly, the Court finds that Bullington is qualified to offer an opinion in this case, including as to the defects in the subject heaters. *See generally* Fed. R. Evid. 702.

*b. Reliability*

As to reliability, Home Depot argues that several of Bullington's opinions should be excluded because they are not supported by sufficient facts or industry standards. Specifically, Home Depot challenges Bullington's opinion that Home Depot knew or should have known of the alleged dangers posed by the subject heaters, that the subject heaters contained defects inconsistent with industry standards, and that the subject heater caused the fire. (*See* ECF No. 183-2 at 9-12.) Home Depot argues that Bullington failed to follow NFPA 921, the methodology for fire investigations, and failed to consider alternative causes of the fire. (*Id.* at 13-17.)

In response, Plaintiff argues that Bullington's opinions are reliable because they were derived from his testing of exemplar heaters and his review of other similar incident reports provided by Home Depot. (ECF No. 186 at 19-22.) Plaintiff further maintains that the use of exemplar testing is a reliable methodology and is endorsed by the National Fire Protection Association. (*Id.* at 20, 28-32.) Any disagreement with Bullington's conclusions, Plaintiff argues, goes to the weight of his opinions, not to their admissibility under *Daubert*. (*Id.* at 21.)

*i Opinion Regarding Home Depot's Knowledge of Failures*

Home Depot argues that Bullington lacked a sufficient factual basis to conclude that it knew or should have known of the alleged dangers posed by the subject heaters. (ECF No. 183-2 at 10.) Home Depot contends that there is no evidence that the heaters involved in the incident reports were the same model as the subject heater. (*Id.*) Home Depot further challenges

Bullington's methodology, namely, that a visual inspection of the subject heaters and the use of exemplars is unreliable under *Daubert*, because Bullington did not perform tests on the exemplar heaters. (*Id.* at 13-14.)

Plaintiff maintains that the use of exemplars is a methodology grounded in science, endorsed by the NFPA and has been deemed reliable under *Daubert* in other cases. (ECF No. 186 at 28-32.) Plaintiff argues that the incident reports on which Bullington relied are relevant to establishing notice to Home Depot and need not involve the same heater model. (*Id.* at 21-22.)

To reiterate, reliability under Rule 702 requires that an expert have "good grounds" for their conclusions, and that the testimony be based on reliable methods and procedures rather than "subjective belief or unsupported speculation." *Cohen*, 125 F.4th at 461-62 (quoting *Karlo*, 849 F.3d at 80-81); *In re TMI Litig.*, 193 F.3d at 665 (citation omitted). Thus, an expert's testimony should not be excluded merely because the court believes there are "better grounds for some alternative conclusion . . . even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result." *Paoli*, 35 F.3d at 744.

The Court is satisfied that Bullington's opinions as to Home Depot's knowledge regarding space heater failures rest on sufficient facts and a reliable methodology. Home Depot's incident report involved oil-filled space heaters that suddenly ruptured and sprayed hot oil in the surrounding area during normal use. (ECF No. 183-3 at 17, 87.) According to Bullington, these incidents were reported to Home Depot prior to Rabbi Mykoff's purchase of the subject heaters in this case. (*Id.*) Further, Bullington reviewed reviews for a Cuori oil-filled space heater similar to the heaters found at the synagogue. (*Id.* at 22, 45.) In these reviews, customers reported a malfunctioning rotary switch and internal melting. (*Id.* at 22, 90.)

Likewise, Bullington's opinions are supported by a sound, reliable methodology, *i.e.*, the physical examination of the subject heater, exemplars, and the testing of exemplars. Examination of exemplars has been recognized as a reliable methodology. *See Smith v. NMC Wollard, Inc.*, Civ. No. 19-5101, 2021 WL 3128674, at *8 (E.D. Pa. July 23, 2021) (finding an opinion based "primarily" on an expert's "personal inspection of an exemplar" to be reliable under *Daubert*); *Kerrigan v. Maxon Ind.*, 223 F. Supp. 2d 626, 640 (E.D. Pa. 2002) (finding an examination of a subject vehicle and an exemplar vehicle to constitute a reliable methodology).

Further, Bullington indicates in his report that he performed tests on the exemplar heaters. (*See* ECF No. 183-3 at 20 (discussing testing of heating elements in the Cuori exemplars).) Even if Bullington's testing was insufficient, it would not render his methodology unreliable. *Pineda*, 520 F.3d at 248 (reversing the exclusion of an engineering expert in a products liability matter where the trial court found the expert unreliable, in part, for failure to conduct adequate testing, holding that the expert's "specialized, rather than generalized, experience" provided a sufficient factual basis for his opinions); *Glielmi v. Raymond Corp.*, Civ. No. 09-5734, 2012 WL 924844, at *6 (D.N.J. Mar. 19, 2012) ("Although a testable hypothesis is one factor a Court should consider in assessing the reliability of an expert, testing is not always applicable."); *see also Jacobs v. Tricam Indus., Inc.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) (finding that "testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence"). Bullington's opinions regarding Home Depot's knowledge are testable, which satisfies the *Daubert* standard. (*See* Bullington's testimony, ECF No. 242 at 49:16-20 ("The observations are certainly testable. Everything is preserved at our facility as far as the exemplar is concerned. Anybody who can get approval to come down to our facility is welcome to look at them.").)

Moreover, the Court finds that any differences in the heater models discussed in the incident reports or exemplars may be explored through cross-examination. "Assuming a rational connection between the data and the opinion—as there [is] here—an expert's reliance on [allegedly] faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 233 (E.D. Pa. 2017); *see also Rodriguez-Jimenez v. Cheadle*, Civ. No. 21-04507, 2024 WL 6912687, at *2 (N.D. Ga. Aug. 19, 2024) (finding the use of an exemplar truck to be reliable even though it may have differed in size from the subject truck, and noting that "cross examination at trial will allow the jury to understand this potential limitation and weigh the evidence accordingly"); *Atanassova v. Gen. Motors LLC*, Civ. No. 20-01728, 2021 WL 683246, at *5 (D.S.C. Feb. 22, 2021) ("To the extent that [the d]efendant challenges, in general terms, the data contained within [t]he [e]xhibits, such an argument goes to the weight and credibility of the witness assessment, not its admissibility." (citation modified)); *Nationwide Mut. Fire Ins. Co. v. Black & Decker (U.S.), Inc.*, Civ. No. 13-14312, 2015 WL 4243281, at *8 (E.D. Mich. July 13, 2015) ("Although [the experts'] exemplar testing might have been more thorough, the Court does not find the methods they used unreliable under Rule 702 and *Daubert*.").

The Court finds that Home Depot's criticisms of Bullington's methods and challenges to the factual bases for his opinions on what Home Depot knew or should have known regarding the dangers of the subject heaters goes to the weight of Bullington's opinions, not to admissibility. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, the Court will not exclude Bullington's opinions as to Home Depot's knowledge regarding the failures of the subject heaters.

*ii Opinions Regarding Defects of Subject Heaters*

Home Depot argues that Bullington's opinions regarding the defects associated with the subject heaters are unreliable as they lack sufficient factual support and fail to cite to any industry standard. (ECF No. 183-2 at 10-11.) Plaintiff argues that Bullington's findings are "self-evident conclusion[s]" supported by a physical observation of the exemplar heating components and measurements, and that Bullington's opinions are the product of deductive reasoning by an experienced fire investigator who has examined hundreds of space heaters. (ECF No. 186 at 25-26.)[10]

In his report, Bullington opines that "[t]he thickness of the metal used in the [exemplar] heater vessel was less than industry standard" and that the Cuori heaters "would have been less likely to rupture during normal use, had the metal conformed to the thickness [he] [] observed in other manufacturer's oil-filled radiator heaters." (ECF No. 183-3 at 72-73.) Bullington reached that conclusion by measuring the combined metal layers of the Cuori exemplar heaters (0.050-inch) and comparing it to "dozens of prior heaters examined," which measured at 0.060-inch. (*Id.* at 15-16.) Bullington explained that the "metal has an effect on the amount of pressure that the fins of the heater can withstand, a reduction in the metal thickness would be expected to result in

---

10 Plaintiff appears to concede that Bullington's opinions as to defects are on shaky grounds. In its opposition brief, Plaintiff describes Bullington's role as that of a "space heater expert" whose "role was to opine on the state of knowledge" and "what was known and knowable to Home Depot, as well as to buttress, by testing, the opinions of Mr. Alexander and Mr. Kandrac, and to explain how internal malfunctions in a space heater can cause and/or exacerbate a fire." (ECF No. 186 at 8, 29.) Plaintiff also explains that Bullington's report "was not intended to pinpoint a precise manufacturing or design defect in the two HD904-A 7Q model space heaters which the Rabbi bought." (*Id.* at 15.) And at the *Daubert* hearing, counsel indicated that Bullington was not offering an opinion "as to whether a specific defect in the particular space heaters at issue caused a fire at [the] synagogue," nor was Bullington offering an opinion "as to where in the synagogue that fire originated." (ECF No. 242 at 22:22-23:5.) However, Bullington opines in his report as to "internal wiring defects" so the Court will address Home Depot's arguments for the avoidance of doubt. (ECF No. 183-3 at 72.)

a reduction in the durability of the heater fins in the event of excessive internal pressure." (*Id.* at 15.) When questioned at the *Daubert* hearing as to any industry standard relied upon, Bullington testified that his opinion was based on his experience, "common sense" and that "it has to do with pressure," meaning that Bullington "think[s] the UL standard requires a pressure of three bar or something inside the vessel as the test." (ECF No. 242 at 47:14-25; 48:1-19.) Bullington's report makes no reference to a UL standard.

Bullington also opined that the subject heater's wiring exhibited "internal wiring defects which could result in electrical arcing," which he explained at the *Daubert* hearing was a determination made pursuant to "empirical evidence" and on the basis of "[o]bservation[s]" of deteriorated slating in the Cuori model. (ECF No. 183-3 at 72; ECF No. 242 at 43:14-25.) Bullington testified that he did not rely on any industry code, standard, or regulation in opining that the Cuori exemplars exhibited wiring defects which could result in electrical arcing. (ECF No. 242 at 71:19-72:6.) As to Bullington's opinion that the "[p]lugs on some heaters exhibited evidence of overheating due to a defect in the electrical service cord plug prong connection," Bullington testified that he made those observations based on his visual observations that he saw "on other heaters coming from manufacturers or being used from other manufacturers in the past." (ECF No. 183-3 at 72, ECF 242 at 44:9-19.)

The Court finds Bullington's opinions as to the defects of the subject heaters are unreliable under *Daubert* and are therefore inadmissible. Although the Court is mindful that "relevant reliability concerns may focus upon [an expert's] personal knowledge or experience," *see Kumho Tire Co.*, 526 U.S. at 150, "there is no reliable foundation for . . . expert testimony when an expert would seem[ ] to base his conclusions on his own authority . . . [w]ithout "industry standards" to rely upon, . . . [b]ecause knowledge connotes more than subjective belief or unsupported

speculation." *Baker v. U.S. Marshal Serv.*, Civ. No. 12-494, 2015 WL 377042, at *9 (D.N.J. Jan. 28, 2015), *aff'd sub nom. Baker v. United States*, 642 F. App'x 147 (3d Cir. 2016) (internal quotations omitted).

For example, in *FinancialApps v. Envestnet, Inc.*, the court excluded portions of an expert's opinion that defendant's implementation of a technology failed to comply with industry standards. No. 19-1337, 2023 WL 5289444, at *3 (D. Del. Aug. 14, 2023). The court found the expert's methodology unsound because not only did the expert fail to sufficiently articulate the relevant industry standard or practice at issue, but he also failed to "sufficiently explain" how the product violated the "generally accepted professional standards" as cited in his report. *Id.* at *2-3. The Court noted that in rendering an expert opinion, "one still needs to know what the benchmark *is* in the first place." *Id.* at *3. Without it, the court cautioned that such an opinion would deviate into an area where expert testimony is not required at all. *Id.*; *see also Kelley v. Reyes*, Civ. No. 19-17911, 2025 WL 2792838, at *5 (D.N.J. Oct. 1, 2025) ("'[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge' . . . where the jury is 'as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation'" (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).).

Bullington's defect opinions suffer from the same problem. Bullington never explains how he reaches his conclusions nor cites any industry standard or method in support. Rather, Bullington's guess that he "think[s]" the UL standard may be applicable or that he "expect[s]" the thickness would impact durability is not tied to any recognized industry standard and instead is based upon no more than his own unsupported speculation. *See FinancialApps,* 2023 WL

5289444, at *3; *see also In re Lincoln Nat'l COI Litig.*, 620 F. Supp. 3d 230, 244 (E.D. Pa. 2022) ("An expert's experience and conclusions cannot 'meet only by assumption'" (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2004)).). Bullington's substitution of "common sense" without analysis or explanation is insufficient under *Daubert*. *See Fedor v. Freightliner*, 193 F. Supp. 2d 820, 832 (E.D. Pa. 2002) (rejecting expert opinions "based solely on intuition" and "generalized common sense"). "Such guesswork is not based on the methods and procedures of science, and cannot serve as the basis for expert testimony." *Daddio v. A.I. DuPont Hosp. for Child. of Nemours Found.*, 650 F. Supp. 2d 387, 407 (E.D. Pa. 2009), *aff'd sub nom. Daddio v. Nemours Found.*, 399 F. App'x 711 (3d Cir. 2010).

Accordingly, the Court finds Bullington's opinions as to the defects of the subject space heaters are unreliable and therefore inadmissible under Rule 702.

*iii Opinions Regarding Cause and Origin*

Finally, Home Depot argues that Bullington lacked the factual basis needed to rule out external causes of the fire because the Congregation did not preserve the plug and plug components along with the extension cords and timers in use at the time of the fire, and because his visual observations are insufficient to opine that internal arcing in the second heater caused the fire. (ECF No. 183-2 at 11-12.) Home Depot maintains that the NFPA requires a fire investigator to consider and eliminate alternative causes in rendering a causation opinion, and Bullington's failure to do so renders his opinions inadmissible. (*Id.* at 13-17.) Plaintiff counters that unlike Kandrac, Bullington is not offering an opining as to the cause of the fire but rather that the space heater components that exhibited evidence of failures could cause components to ignite and start a fire. (ECF No. 186 at 28-32.) The Court agrees with Plaintiff.

In his report, Bullington opines that failures in oil-filled radiator heaters can cause a fire which results in property damage, personal injury, and death, an opinion Bullington testified was

supported by the number of cases he worked on where fires were the result of an internal malfunction. (ECF Nos. 183-3 at 71; ECF No. 242 at 41:9-17.) Bullington also reviewed online information from organizations such as the Consumer Product Safety Commission (CPSC) and the Federal Emergency Management Agency (FEMA) about heaters in general and oil-filled heaters specifically, data that is typically reviewed in determining if an appliance caused property damage or personal injury as a consequence of an internal malfunction. (ECF No. 242 at 41:18-42:3.) The Court finds Bullington's expertise and knowledge regarding failures associated with oil-filled heaters together with his review of these online materials is sufficient to satisfy Rule 702. *See Miller ex rel. Miller v. Evenflo Co.*, Civ. No. 09-108, 2011 WL 7037126, at *3 (W.D. Pa. Dec. 29, 2011) (noting that Rule 702's objectives "can be accomplished in a number of different ways, including through the review of experimental, statistical, or other scientific data generated by others in the field" (quoting C*ummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir.1996))); *Qin v. Vertex, Inc.*, Civ. No. 20-2423, 2021 WL 5631751, at *4 (E.D. Pa. Nov. 30, 2021) ("It is not uncommon for experts to consider and rely upon articles in their industry or field as a basis for their opinions."); *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) (noting that an expert's opinion may be deemed reliable if it is based on the witness's expertise and knowledge of the subject he is testifying about).

Similar to how it mischaracterized Alexander, Home Depot mischaracterizes Bullington as a cause and origin expert. Contrary to Home Depot's assertion, Bullington was not required to eliminate alternative causes of the fire under NFPA 921 because Chapter 18 of the NFPA, which would require him to consider alternate hypotheses, is inapplicable to his role. *See* NFPA 921 § 18.7. Bullington's opinions are confined to the failures that *may* present fire hazards in oil-filled

space heaters. Bullington's opinions do not extend to cause and origin, and nothing in his report suggests otherwise.

Furthermore, Home Depot's reliance on *Chester Valley* and *Oddi* is misplaced. *See Chester Valley Coach Works, Inc. v. Fisher-Price, Inc.*, Civ. No. 99-4197, 2001 WL 1160012 (E.D. Pa. Aug. 29, 2001); *Oddi*, 234 F.3d 136. *Chester Valley* involved a fire causation expert who failed to base his opinions "on any testing, experimentation, or generally accepted texts, treatises, or other writings," and conducted a cause and origin investigation in accordance with his own self-created methodology. 2001 WL 1160012, at *3-8. There, the court acknowledged that had the expert followed a recognized and reliable methodology such as NFPA 921, it would "have little trouble admitting his testimony." *Id.* at *5. And, in *Oddi*, where the plaintiff's expert was proffered to opine as to a design defect of a truck, the court found the expert's testimony unreliable because "he used little, if any, methodology beyond his own intuition" by failing to test his hypotheses and failing to calculate specific data necessary to support his conclusions. *Oddi*, 234 F.3d at 155-58. Here, the Court has already ruled that Bullington's methodology involving the use of exemplars in conjunction with the subject heaters is reliable. Thus, Home Depot's contention that Bullington did not perform a comprehensive cause and origin investigation does not establish that his opinions lack a sufficient factual basis or are unreliable under *Daubert*.

*4. Richard F. Regenthal, P.E.*

Plaintiff seeks to exclude two of Regenthal's opinions: (1) that the bead he observed in the second space heater was caused by melting rather than electrical arcing, and 2) that the fire originated underneath the Bimah due to faulty wiring. (*See* ECF No. 179-1 at 16, 31.) [11] As to Regenthal's first opinion, Plaintiff argues that Regenthal did not evaluate the heaters consistent

[11] Plaintiff does not challenge Regenthal's qualifications.

with NFPA 921 section 9 or the NFPA standards associated with evidence of electrical arcing. (*Id.* at 20-23 (citing NFPA 921 §§ 9.10, 9.11.) As to Regenthal's opinion that the fire could have originated under the bimah, Plaintiff argues that Regenthal's opinions were not based upon sufficient facts because he lacked key information such as the type of wiring under the bimah, the type of wood that comprised the bimah, and information on temperatures and humidity. (*Id.* at 33-35.) Plaintiff also argues that while Regenthal testified as to the information he would need to render an opinion as to the cause of the fire, Regenthal made no attempt to obtain this information, and neither did Home Depot during discovery. (*Id.* at 33-37.)

Home Depot argues that Plaintiff mischaracterizes Regenthal's opinions. (ECF No. 189 at 6.) According to Home Depot, Regenthal did not opine that the fire was caused by an electrical malfunction, nor did he render an opinion on how the fire started in the bimah. (*Id.*) Rather, Regenthal's opinion is intended to identify other potential causes of the fire that were not considered by Plaintiff's experts contrary to NFPA 921. (*Id.*) Home Depot also argues that Regenthal's opinion that the heater exhibited signs of melting versus electrical arcing is supported by his experience, physical evidence, and guidance from the NFPA. (*Id.* at 11-14.)

The Court finds that Regenthal's opinions satisfy *Daubert*'s reliability prong. First, the Court will not exclude Regenthal's testimony that the bead on the subject heater formed as a result of melting as opposed electrical arcing. Like Alexander, Regenthal relied upon NFPA 921 as well as his experience as an engineer and extensive field experience as a former firefighter and cause and origin investigator in reaching his conclusions. *See generally* ECF Nos. 189-3, 189-4.). Plaintiff's disagreement with Regenthal's analysis of the NFPA 921 is better left for cross-examination. *See Mitchell*, 365 F.3d at 244; *Daubert*, 509 U.S. at 596; *see also In re Gabapentin*

*Patent Litig.*, 2011 WL 12516763, at *10 (a disagreement between experts regarding application of a methodology presents "a battle of the experts" for the jury to decide).

As to Regenthal's opinion that the fire "may have" ignited under the bimah, the Court agrees with Home Depot that Regenthal is not opining as to the cause of the fire but rather identifying other potential causes that Plaintiff's experts failed to consider—a failure that Regenthal argues was contrary to NFPA 921. Specifically, Regenthal opines that Plaintiff's experts failed to consider the use of extension cords "running under a makeshift platform," the "widespread" use of plug-in timers, the failure to exam the building receptacles or building wiring and that the failure of the wiring between the bimah and the ceiling below "*could have* ignited the wood floor structure and caused a fire" therefore "all possible sources of ignition were not considered as required by NFPA 921. (ECF No. 181-6 at 14-15) (emphasis added). Regenthal's opinions were based on his review of photographs, deposition testimony, and Plaintiff's expert reports. (*Id.* at 11-15); *Travelers Property Cas. Co. of America v. Cooper Crouse–Hinds, LLC,* Civ. No. 05-6399, 2007 WL 2571450, *9 (E.D. Pa. 2007) (noting that an expert's reliance on the case file in a fire cause and origin case, which included photographs, other investigator's reports, and other relevant evidence satisfied *Daubert*'s reliability prong). Regenthal acknowledged the limitations of his opinions and that he could not opine as to the cause of the fire, all of which can be explored through cross-examination. (ECF No. 189-2 at 50:18-21 ("I, in no way[,] . . . am saying . . . that . . . with a reasonable degree of certainty that that's what happened within this bimah. I don't know.").) Thus, the Court finds Regenthal's opinions reliable under Rule 702.

### B. Motion for Spoliation Sanction

Home Depot argues that Plaintiff should be sanctioned due to its spoliation of the fire scene. (ECF No. 180-2 at 25.) Home Depot argues that Plaintiff's "inexcusabl[e]" delay in waiting three years to notify it of the fire, despite also knowing that litigation against Home Depot was likely,

establishes actual suppression and withholding of evidence to warrant sanctions. (*Id.* at 23, 26-27; *see also* ECF No. 194 at 21.) According to Home Depot, Plaintiff deprived it of the opportunity to immediately inspect the fire scene and preserve relevant items prior to interference by the outside elements and third parties. (ECF No. 180-2 at 19-22, 27-28.) Home Depot further argues that Dorfman's attempts to influence Detective O'Malley's investigation of the fire and Rabbi Mykoff's letter to the Middlesex County Prosecutor's Office seeking changes to Detective O'Malley's findings were done "for the explicit purpose of aiding the Congregation in its lawsuit against Home Depot," and demonstrates Plaintiff's intent to withhold access to certain information. (*Id.* at 28-30; *see also* ECF No. 194 at 20.) Home Depot argues that Plaintiff's initial refusal to cooperate with Detective O'Malley and "obstruct[] access to information for anyone they did not see as sharing their interests" constitutes "a hallmark of bad faith." (ECF No. 180-2 at 28-30, see also ECF No. 194 at 18-21.)[12]

Plaintiff argues that there was no spoliation because "the condition of the building and its contents" were available to Home Depot. (ECF No. 188 at 26.) Plaintiff submits that Home Depot could have requested a site inspection in 2018, when this action was filed, and that an inspection was scheduled for January 2019, before the building was demolished. (*Id.* at 25-26.) Plaintiff further argues that "deferring the filing of its complaint" or permitting people to visit the property when the Congregation sought to sell it is not evidence of bad faith to warrant sanctions. (*Id.* at 26-27.) Plaintiff also argues that the Congregation did not interfere with the fire investigation, but contacted Detective O'Malley to "correct and clarify" information in his report, "which had

---

[12] Home Depot also requests that the Court bar the subject space heaters from being introduced at trial because Plaintiff cannot properly authenticate them pursuant to Rule 901. (ECF No. 180-2 at 33.) As discussed during the *Daubert* hearing, the Court finds Home Depot's authentication challenge to be premature and would be more appropriately addressed at trial. (*See* ECF No. 242 at 181:3-191:11, 215:5-6.)

already been written and distributed." (*Id.* at 28-30). Finally, Plaintiff notes that while there were "a handful of visits" made to the synagogue after the fire, it maintains that "there is nothing in the discovery record to indicate that evidence was removed," and those items that were removed are irrelevant to this case as it consisted of religious articles and a book of memorials. (*Id.* at 30-31.)

Spoliation occurs where: "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Neal*, 2024 WL 3466800, at *3. Only after the movant satisfies this threshold showing does the Court proceed to analyze whether and what sanctions are appropriate. *Id.*; *Bull*, 665 F.3d at 73 n.5. The parties do not appear to dispute that the fire scene was under Plaintiff's control and that it is relevant to the claims and defenses in this case; therefore, the Court will only address Plaintiff's duty to preserve and whether there was actual suppression or withholding of evidence by Plaintiff.

*1. Duty to Preserve*

Home Depot argues that sanctions are warranted because Plaintiff had a duty to preserve the fire scene as it contained evidence regarding potential alternative causes of the fire. (ECF No. 180-2 at 32-33.) Home Depot argues that the duty to preserve attached as early as October of 2016, when Rabbi Mykoff contacted a law firm in New York City to represent it in connection with possible litigation resulting from the fire. (*See* ECF No. 215 at 12.) However, Home Depot also argues that the testimony of Rabbi Mykoff and Burr confirms that Plaintiff suspected the heaters as the cause of the fire long before October 2016, and as such, litigation was foreseeable much earlier. (*Id.* at 12 n.5.) Plaintiff does not respond to Home Depot's arguments, but in a footnote cites to case law from another circuit that denied spoliation sanctions where a plaintiff was "unsophisticated and unaccustomed to the preservation requirements of litigation," and notes

that the Rabbi was *pro se* when Home Depot was first served in July 2018. (*See* ECF No. 222 at 5 & n.1.)

The duty to preserve evidence "arises when the party in possession of the evidence knows that litigation [involving] the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." *Kounelis*, 529 F. Supp. 2d at 518 (citations omitted). In other words, "[t]he duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'" *Neal*, 2024 WL 3466800 at *5 (quoting *Dunn v. Mercedes Benz of Fort Wash., Inc.*, Civ. No. 10-1662, 2012 WL 424984, at *5 (E.D. Pa. Feb. 10, 2012)). Reasonable foreseeability is a "flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.'" *Bull*, 665 F. 3d at 77-78 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). Reasonable foreseeability is also an objective inquiry, focused not "whether a party actually anticipated litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020) (citation modified); *Prime Energy & Chem., LLC v. Tucker Arensberg, P.C.*, Civ. No. 18-0345, 2020 WL 5653351, at *3 (W.D. Pa. Sept. 23, 2020). To determine whether a duty to preserve has been triggered, "the type and seriousness of the alleged injury, the tendency of certain kinds of incidents to lead to litigation, and whether the defendant initiated an investigation into the incident are all relevant to the determination." *Neal*, 2024 WL 3466800 (citing *Bistrian*, 448 F. Supp. 3d at 468 (E.D. Pa. 2020)).

The Court holds that, starting immediately after the fire, Plaintiff had a duty to preserve the fire scene, including the Sunbeam heater. After the fire, a party in Plaintiff's position should have

foreseen filing this lawsuit. The injury Plaintiff suffered was serious and of a kind that can lead to litigation. (*See* ECF No. 182-4 at 10-24 (showing the scale of destruction caused by the fire); Burr Tr. 136 (describing comments from the community that the fire was "a terrible thing" and stating that the fire was a "constant topic of conversation for years")); *see e.g., Morgan v. Sellers*, Civ. No. 16-3968, 2016 WL 9774884, at *1 (E.D. Pa. Sept. 26, 2016) (noting that plaintiffs sued the manufacturers and distributors of a space heater after a fire); *Howell v. Maytag*, 168 F.R.D. 502, 507 (M.D.P.A. 1996).

The record demonstrates that Plaintiff knew the Cuori space heaters were a potential cause of the fire immediately after the fire occurred. Burr testified that, within a month of the fire, Rabbi Mykoff asked him "to look around for any articles or advertising about space heaters," and the articles Burr provided included "[a]rticles about space heaters of this general design that failed or broke or exploded or burned or leaked oil." (Burr Tr. at 83:16-84:22.) Burr also testified that, after the fire, the rabbi had strong suspicions as to the fire's cause, so much so that he expected the fire investigator to agree with him. (*Id.* at 91:12-15.) Indeed, O'Malley testified that Dorfman asked him to "blame the heater for the fire." (O'Malley Tr. at 120:5-122:6.) A party in Plaintiff's shoes, and with Plaintiff's knowledge that the fire was potentially caused by a space heater, should have foreseen that party's own litigation against the seller of the suspect space heater.

Plaintiff also reasonably should have known that Home Depot would be "harm[ed] or prejudice[d]" in this litigation by Plaintiff's decisions to discard the Sunbeam heater and generally fail to preserve the fire scene. (*See* Mykoff Tr. at 151:16-155:21 (detailing Rabbi Mykoff's determination that the Sunbeam heater was "irrelevant and shouldn't be saved").) After the fire, in line with Rabbi Mykoff's theory that the Cuori space heaters caused the fire, Plaintiff took care to preserve the Cuori heaters and have them inspected. (*See id.* at 137:17-138:15, 139:4-12,

228:15-229:24 (noting that the heaters were placed in "storage" in Dorfman's backyard, preserved for inspection by attorneys, and shipped to an unknown facility in Maryland to be inspected).) A reasonable party in Plaintiff's position would have known that any evidence that could suggest something other than the Cuori heaters caused the fire—like the Sunbeam heater present at the scene—would be material to any defendants in litigation alleging that the Cuori heaters were the cause of the fire.

Plaintiff thus had a duty to preserve the fire scene including the Sunbeam heater. *See Allstate Ins. Co. v. Sunbeam Corp.*, 865 F. Supp. 1267, 1279 (N.D. Ill. 1994) (finding that plaintiff had a duty to preserve "all reasonably relevant evidence," including evidence of alternate causes of the fire). This duty began immediately after the fire. *See Maytag*, 168 F.R.D. at 507 ("While . . . preservation [of a fire scene] need not be perpetual, plaintiffs had an affirmative duty to give [defendants] the opportunity to conduct a prompt investigation."); *see also Erie Ins. Exch. ex rel. McCracken v. Applica Consumer Prods., Inc.*, Civ. No. 02-1040, 2005 WL 1165562, at *4 (M.D. Pa. May 17, 2005) (imposing a duty to preserve evidence relevant to the origin and cause of the fire "immediately following the fire" where the party knew that the defective product was a potential cause of the fire). Plaintiff's duty to preserve evidence thus applied when Rabbi Mykoff decided that the Sunbeam space heater should be discarded and during the three years in between when the fire occurred and when Plaintiff notified Home Depot.

The Court is mindful that, in certain instances, "the scope of the duty to preserve is not boundless" and, "[g]enerally, there is no blanket rule that plaintiffs must always preserve an entire fire scene." *Dyvex Indus., Inc. v. Agilex Flavors & Fragrances, Inc.*, Civ. No. 12-0979, 2018 WL 1070803, at *9 (M.D. Pa. Feb. 27, 2018) (quoting *Cmty. Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp., Inc.*, Civ. No. 09-0257, 2013 WL 818596, at *6 (M.D. Pa. Mar. 5, 2013). However,

"[at] a minimum, if the plaintiff knows that a particular party is potentially responsible, in the absence of exigent circumstances the plaintiff should provide this party with the opportunity to inspect the evidence. [I]f the plaintiff's investigation reveals that a [p]articular product may be the cause of the fire, the plaintiffs should preserve the product itself. If the investigation reveals alternative potential sources of the fire, these alternative sources should be preserved because they present clearly relevant defense evidence." *Community Ass'n Underwriters of America*, 2013 WL 818596, at *6 (citation modified).

The Court finds Plaintiff had a duty to preserve the Sunbeam heater as a product that may have caused the fire in this case, along with the rest of the fire scene.

*2. Actual Suppression or Withholding*

The Court also agrees with Home Depot that evidence from the fire scene was actually suppressed or withheld, and that this was done in bad faith.

"In order for spoliation to be actionable the moving party must demonstrate 'actual suppression or withholding of the evidence,' which requires a showing of intent apart from establishing the alleged conduct as a matter of fact. *Kuhar v. Petzl Co.*, Civ. No. 16-0395, 2018 WL 6363747, at *5 (D.N.J. Nov. 16, 2018), *report and recommendation adopted,* Civ. No. 16-395, 2018 WL 6331675 (D.N.J. Dec. 4, 2018) (quoting *Bull*, 665 F.3d at 79). Indeed, "a finding of bad faith is pivotal to a spoliation determination." *Bull*, 665 F.3d at 79. Bad faith spoliation encompasses "advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *Kuhar*, 2018 WL 6363747 at *7 (citation modified). To find that plaintiffs acted in bad faith, a court must find that they "intended to impair the ability of [defendants] to defend [themselves]." *Id.* (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)). Destruction that occurs "as a result of inadvertence, routine practice, or accident is not spoliation." *Neal*, 2024 WL 3466800, at *6 (citation modified).

Since a party's intent "is the cornerstone of the spoliation analysis," and courts cannot see inside of parties' minds, courts may look to circumstantial evidence to determine whether a party acted in bad faith. *Neal*, 2024 WL 3466800, at *7 (quoting *Bistrian*, 448 F. Supp. 3d at 475). A finding of bad faith can be inferred from "facts such as timing and method of the loss of evidence, whether the lost information was harmful to the party in control, . . . shifting representations offered by the party or their counsel to explain the non-production of evidence [or] . . . misrepresentations and other misconduct by a party's attorney." *Id.* at *7. Additionally, "[s]elective preservation can also reflect intent," because "[c]ommon sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality." *Bistrian*, 448 F. Supp. 3d at 475-76.

While Plaintiff contends that Home Depot could have inspected the fire scene when Plaintiff notified Home Depot of this action in 2018, three years after the fire occurred, the record before the Court demonstrates that evidence was suppressed or withheld following the fire. Plaintiffs' selective preservation of evidence supports this conclusion. Plaintiff took care to preserve the Cuori heaters after the fire and provide the heaters to Plaintiff's attorney. (*See* Kammer Tr. at 72:4-19; Mykoff Tr. at 137:17-138:15, 139:4-12; 150:12-16.) Plaintiff did not take the same care with the Sunbeam space heater and other potential evidence at the fire scene. Rather than preserving the Sunbeam space heater, Rabbi Mykoff determined the Sunbeam heater was "irrelevant and shouldn't be saved," and he testified that the heater "probably went out and was disposed of." (Mykoff Tr. at 152:2-155:21.) Rabbi Mykoff also confirmed that other "debris" was removed from the fire scene, individuals were removing items from the property and disposing of them, and that he did not recall anyone preserving any extension cords, outlets, or other electrical components. (*Id.* at 149:5-15, 152:2-6, 159:16-19.) Plaintiff's selective preservation of the Cuori

space heaters but not other evidence from the fire scene weighs in favor of a finding of bad faith. *Bistrian*, 448 F. Supp. 3d at 475-76.

Additionally, the record indicates that, starting shortly after the fire, Plaintiff attempted to influence evidence in ways that might be helpful to this litigation. Detective O'Malley testified that Dorfman repeatedly contacted him about his investigation into the fire. (O'Malley Tr. at 42:8-15.) O'Malley testified that, while he did not believe Dorfman was asking him to do things "against the law," Dorfman was "invasive," and inquired as to whether Detective O'Malley could "blame . . . things," or "lean towards something versus not lean towards something" in his investigation. (*Id.* at 41:19-42:15.) O'Malley later testified that Dorfman asked him to "blame the heater for the fire," a conclusion that O'Malley said would not have been "factually supported." (*Id.* at 120:5-122:6.)

Plaintiff also tried to influence evidence specifically to bolster Plaintiff's theory that the Cuori heaters might be to blame, a theory that it appears Plaintiff started developing soon after the fire. (*See* Belekin Tr. at 83:16-84:20-22 (noting that Rabbi Mykoff asked Burr to look into space heaters "probably within a month after the fire"); Kammer Tr. at 72:4-19 (describing synagogue's actions to preserve Cuori heaters); Mykoff Tr. at 137:17-138:15, 139:4-12 (same).) In June 2020—three years after Detective O'Malley issued his fire investigation report identifying the Sunbeam heater, and after Plaintiff commenced this litigation—Rabbi Mykoff requested that Detective O'Malley make a number of factual amendments to his report and delete information that the rabbi admitted would be harmful to this litigation. (ECF No. 180-4 at 249-253 (stating that certain parts of O'Malley's statement had "the potential to injure the Congregation in its effort to recover compensation for the loss of the building.").) These amendments included 1) changing the brand name of the heaters involved in the fire from Sunbeam to Cuori; 2) amending the report to state

that the heaters were only "half-filled with liquid," which was "waste oil contaminated with volatile, flammable, and explosive components," and half-filled with "flammable oil vapor"; 3) a requested change that clarified that O'Malley's office "did not discover" the Cuori heater on the side of the bimah, but that the congregation's investigator later discovered the heater with "bulging fins with holes resembling bullet holes, evidencing the explosion that had occurred inside the heater"; and 4) that "there were no extension cords in use on the main sanctuary floor." (*Id.* at 251-52.) O'Malley testified that these significant proposed changes would not reflect the determinations he made at the time of his investigation and that some of the changes contradicted the evidence he observed. (O'Malley Tr. at 65:3-71:21.) Plaintiff's attempts to influence the investigation of the fire in ways that would benefit this litigation also weigh in favor of finding that Plaintiff acted in bad faith when Plaintiff failed to preserve evidence from the scene.

Taking the evidence as a whole, the Court finds that Plaintiff, the party with superior access to information, engaged in the type of advantage-seeking behavior that warrants a finding of bad faith. *Kuhar*, 2018 WL 6363747 at *7 (citation modified).

*3. Sanctions*

Home Depot seeks an adverse inference instructing the jury that preservation of the fire scene would have produced evidence of an alternative cause of the fire. Ultimately, the Court exercises discretion to determine the appropriate sanction. *United States for Use of Colorado Custom Rock Corp.*, Civ. No. 20-2968, 2023 WL 3212516, at *8 (citing *Micron Tech., Inc.*, 645 F.3d at 1326, and *Kounelis*, 529 F. Supp. 2d at 520-21).

"To provide redress to the party harmed by spoliation, as well as to punish the spoliator, a court may impose appropriate sanctions pursuant to the Federal Rules of Civil Procedure and the court's inherent powers." *Kounelis*, 529 F. Supp. 2d at 519 (citations omitted). Spoliation sanctions serve several functions: (1) "a remedial function by leveling the playing field or restoring

the prejudiced party to the position it would have been without spoliation;" (2) "a punitive function, by punishing the spoliator for its actions; and (3) "a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be." *Est. of Tattoli*, 2025 WL 1837567, at *2 (quoting *Mosaid Techs. Inc.*, 348 F. Supp. 2d at 335).

The key considerations' for determining whether sanctions are appropriate are: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79. "The party seeking sanctions bears the burden of proof as to each element of the prima facie claim." *Kuhar*, 2018 WL 6363747, at *5.

Sanctions can include dismissal of a claim or defense, suppression of evidence, an adverse inference, fines, and an award of attorneys' fees and costs. *United States for Use of Colorado Custom Rock Corp. v. G&C Fab-Con, LLC*, Civ. No. 20-2968, 2023 WL 3212516, at *6 (D.N.J. May 2, 2023) (citing *Kounelis*, 529 F. Supp. 2d at 519). An adverse inference "permits a jury to infer that destroyed evidence might or would have been unfavorable to the position of the offending party." *Kounelis*, 529 F. Supp. 2d at 518. The inference "is predicated on the 'common sense observation' that when a party to an adversarial proceeding destroys relevant evidence it is likely done out of fear that the evidence would be harmful to that party." *Id.* Thus, the spoliation inference "level[s] the playing field after a party has destroyed or withheld relevant evidence." *Kounelis*, 529 F. Supp. 2d at 518 (quoting *Mosaid Tech. Inc.*, 348 F. Supp. 2d at 338). "A dispositive sanction is warranted only where 'the non-responsible party's case is severely impaired

because it lacked the information that was not produced.'" *GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Bull*, 665 F.3d at 83). The Court considers the three factors identified in *Schmid* to determine the appropriate sanction in this case.

*a. Fault*

As the party in complete, exclusive control of the fire scene and its preservation, the Court finds there is a degree of fault by Plaintiff. *Howel*, 168 F.R.D. at 506 (imposing a "greater degree of fault" where a party was the owner of the property involved in a fire and "had control over [the fire scene's] preservation or destruction"); *see also Dyvex Indus., Inc. v. Agilex Flavors & Fragrances, Inc.*, Civ. No. 12-0979, 2018 WL 1070803, at *11 (M.D. Pa. Feb. 27, 2018) ("[T]he court considers the fact that [plaintiff] and its officials were in complete control of the fire scene and had exclusive authority with respect to the preservation of evidence. . . . This factor increases the amount of fault attributable to [plaintiff]."). Plaintiff has provided no reason for failing to notify Home Depot of the fire in the three years preceding this action or why certain items were discarded from the fire scene. *See id.* at *12 (finding that there "was no reason why [defendant] was not first given the opportunity to inspect the scene undisturbed and to conduct an exploratory investigation before anything was moved or returned. . . . [T]he court finds [plaintiff's] degree of fault to be relatively high."); *Howell*, 168 F.R.D. at 507 (finding that preserved evidence from a fire scene, such as photos, the alleged defective product, outlets, and wiring "do not provide the same opportunity for inspection of other possible causes that [the defendant] would have enjoyed had it conducted an on-scene investigation."); *Baliotis*, 870 F. Supp. at 1291 (finding that despite certain evidence being preserved, a party "cannot refute the assertion that demolition of the fire scene resulted in destruction of otherwise relevant evidence"). Accordingly, the Court finds that there is some degree of fault by Plaintiff in failing to preserve the fire scene.

*b. Prejudice*

With regard to prejudice, courts recognize that "a manufacturer of a product that is allegedly responsible for causing a fire is prejudiced if it cannot have its own cause and origin expert inspect a fire scene for other potential causes." *Baliotis*, 870 F. Supp. at 1291 (citing *Schmid*, 13 F.3d at 80). For example, in *Howell*, plaintiffs brought a products liability action against the manufacturer of a microwave oven that allegedly caused a fire. 168 F.R.D. at 503. The fire scene was destroyed before the defendant manufacturer had an opportunity to inspect the scene, and all that remained were residual pieces of evidence such as photographs, the allegedly defective microwave itself, electrical outlets, and wiring. *Id.* at 506-07. In assessing prejudice, the court noted that "[w]hile [the defendant] can examine the microwave for the alleged fault which plaintiffs assert gives rise to its liability, as well as the burn patterns shown in plaintiffs' photographs of the scene, it has been denied the opportunity to examine other possible causes of the fire," an opportunity "crucial" to defendant's defense. *Id.* at 507. While the defendant would be able to cross-examine the plaintiffs' experts on plaintiff's theory of the case, the court held that "[t]his opportunity can not, however, replace an independent investigation to identify alternative causes." *Id.* Thus, the court held that spoliation sanctions in the form of a jury instruction at trial as to the adverse inference was warranted. *Id.* at 508.

While Home Depot has not been wholly deprived of its ability to defend itself in this action, it was prejudiced in its inability to conduct a timely inspection of the property and the evidence from the fire scene. Although Home Depot's expert, Regenthal was able to identify other potential causes of the fire, he could not opine as to the actual cause of the fire due to his inability to conduct an appropriate inspection and investigation. As the Court in *Howell* noted, expert testimony and cross-examination cannot "replace an independent investigation to identify alternative causes."

*Howell*, 168 F.R.D. at 507. As a result, the Court finds that Home Depot has been unduly prejudiced in its ability to maintain a defense with respect to causation.

*c. Sanction*

The Court finds that the lesser sanction of a spoliation inference is warranted in this case. Home Depot's defense of this case, while not impossible, has been rendered more difficult by the lack of a timely opportunity to inspect the fire scene. Home Depot lost the ability to inspect the Sunbeam heater that was discarded as well as other potential evidence such as the outlets, extension cords or timers. *See Baliotis*, 870 F. Supp. at 1292-93 (finding that [p]roperty insurers who permit the destruction of a fire scene after identifying subrogation targets should suffer some sanction where . . . it is clear that relevant evidence has been lost); *Erie Ins. Exchange ex rel. McCracken*, 67 Fed. R. Evid. Serv. 313 at *5 (imposing a spoliation inference where a party failed to notify a manufacturer for four months following a fire, at which time the fire scene was already destroyed, and noting that property owners may be "induce[d] . . to provide notice to manufacturers and insurers and an opportunity to inspect" if they knew "that sanctions may be imposed for loss of relevant evidence" of a fire scene and potential other causes of the fire); *Howell*, 168 F.R.D. at 507-08 (imposing an adverse inference and noting that a more severe sanction may prove necessary where a party failed to preserve a fire scene and failed to give timely notice to the defendant prior its destruction, despite also recognizing that the *Schmid* factors weighed more heavily against the spoliating party than in *Schmid* or *Baliotis*). An instruction to the jury that it may consider that the lost evidence would be unfavorable to Plaintiff is consistent with the evidentiary rationale underlying the adverse inference, which is "the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy it is more likely to have

been threatened by that evidence than a party in the same position who does not destroy the evidence." *Baliotis*, 870 F. Supp. at 1292 (citation modified).

Home Depot requests that the Court instruct the jury that "proper notice of the fire to Home Depot would have resulted in evidence of alternative causation of the fire." (ECF No. 180-9 at 1.) The Court finds that Home Depot's request goes too far. Instead, having considered the degree of fault of Plaintiff, the degree of prejudice to Home Depot, and the least onerous sanction corresponding the degree of fault and prejudice suffered, the Court finds it appropriate to issue an adverse inference instruction that the lost evidence from the fire scene, including the Sunbeam heater, would have been unfavorable to Plaintiff had that evidence been preserved.

## IV. CONCLUSION

For the foregoing reasons, and other good cause shown, Home Depot's Motion for Sanctions (ECF No. 180) is **GRANTED in part** and **DENIED in part**. Home Depot's Motions to exclude Plaintiff's experts (ECF Nos. 181, 182, 183) are **GRANTED in part** and **DENIED in part**. Plaintiff's *Daubert* Motion, (ECF No. 179), is **DENIED**. An appropriate Order follows.

Dated: October 21, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE